942 F.2d 1391
 CITY AND COUNTY OF SAN FRANCISCO; the Airports Commission
of the City and County of San Francisco, Petitioners,
v.
FEDERAL AVIATION ADMINISTRATION; Department of
Transportation, National Transportation Safety
Board, Respondents. (Three Cases)
COUNTY OF SAN MATEO, Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION; Department of
Transportation, National Transportation Safety
Board, Respondents. (Two Cases)
CITY AND COUNTY OF SAN FRANCISCO; the Airports Commission
of the City and County of San Francisco, Petitioners,
v.
FEDERAL AVIATION ADMINISTRATION; Department of
Transportation, National Transportation Safety
Board, Respondents,
Burlington Air Express ("Burlington"), Respondent-Intervenor.
 Nos. 89-70055, 89-70053, 89-70057, 89-70482, 89-70483 and 89-70500.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1990.
Decided Aug. 21, 1991.
 
 Steven S. Rosenthal, Morrison & Foerster, Washington, D.C., Porter Goltz, Deputy County Counsel, County of San Mateo, Redwood City, Cal., for petitioners.
 John A. Bryson, U.S. Dept. of Justice, Washington, D.C., for respondents.
 John W. Simpson, Kelley Drye & Warren, Washington, D.C., for intervenor.
 Kenneth R. Williams, Deputy Atty. Gen., and Larry A. Thelen, Dept. of Transp., Sacramento, Cal., for amicus.
 Petition to Review a Decision of the Federal Aviation Administration.
 Before BROWNING, PREGERSON and TROTT, Circuit Judges.
 JAMES R. BROWNING, Circuit Judge:
 
 
 1
 The City and County of San Francisco petitions for review of a decision of the Federal Aviation Administration (FAA) denying San Francisco's applications for airport improvement grants from the Airport and Airway Trust Fund. We affirm in part and reverse in part.
 
 
 2
 * The Airport and Airway Trust Fund is made up of amounts equivalent to taxes on aviation fuel and air transportation received by the Treasury. See 26 U.S.C. § 9502 (1988). Money from the Trust Fund is allocated, pursuant to The Airport and Airway Improvement Act of 1982, 49 U.S.C.App. §§ 2201-27 (1988), to finance the operation and improvement of major airports. Potential recipients include "primary airports" like San Francisco International Airport. See 49 U.S.C.App. §§ 2202(a)(12), 2205(a)(2)(B).
 
 
 3
 To receive funds from the Trust Fund, an airport proprietor must submit a grant application to the Secretary of Transportation assuring the "airport to which the project relates will be available for public use on fair and reasonable terms and without unjust discrimination...." 49 U.S.C.App. § 2210(a)(1). San Francisco submitted grant applications for fiscal years 1986 through 1989. The FAA rejected the applications on the ground San Francisco had violated the assurance of nondiscrimination by unjustly discriminating against a retrofitted Boeing 707 airplane (Q707) through a Noise Abatement Resolution adopted by San Francisco's Airports Commission in 1978 ("1978 Regulation").
 
 
 4
 The FAA establishes standards for aircraft noise levels through a certification system. See 49 U.S.C.App. §§ 1423, 1431. Aircraft are certified as Stage 1 (not allowed to operate in the U.S. after 1985), Stage 2, and Stage 3 (most quiet) based on the decibels they emit. See 14 C.F.R. Part 36 (1991). Stage 1 aircraft may be retrofitted to meet Stage 2 standards; the Q707 involved in this case is such a retrofitted Stage 1 aircraft.
 
 
 5
 San Francisco's 1978 Regulation prohibited aircraft from continuing operations at the Airport after January 1, 1985 unless certified as Stage 2 (or Stage 3) or retrofitted to meet Stage 2 certification requirements. Aircraft like the Q707 that had been retrofitted to meet Stage 2 certification requirements could begin operations at the Airport after January 1, 1985, only if the FAA had certified at least one plane of the same type as meeting Stage 2 requirements before January 1, 1985. Because FAA regulations required Stage 3 certification for new aircraft after November 1975, the practical effect of San Francisco's regulation was that only Stage 3 aircraft and "grandfathered" Stage 2 aircraft were allowed to operate at the Airport after January 1, 1985.
 
 
 6
 Burlington Air Express, an all-cargo carrier, applied to the San Francisco Airports Commission in August 1985 for a waiver of the 1978 Regulation so it could operate several retrofitted Q707s at the Airport. These planes received Stage 2 certification from the FAA in March 1985, three months after San Francisco's cutoff date of January 1, 1985. Burlington's waiver application was denied. Since the denial, Burlington has operated its Q707s from Oakland Airport across San Francisco Bay.
 
 
 7
 While Burlington's waiver request was pending before the Commission, Burlington filed a complaint with the FAA. The FAA's Chief Counsel issued a Notice of Proposed Cease and Desist Order, alleging exclusion of Burlington's Q707 aircraft was unjustly discriminatory in violation of section 2210(a)(1) and San Francisco's grant assurance.[1] The notice suspended airport improvement grants to San Francisco.
 
 
 8
 After a hearing, a Department of Transportation Administrative Law Judge held San Francisco had breached its assurance that it would operate the Airport without unjust discrimination. The Administrator of the FAA affirmed, holding the 1978 Regulation unjustly discriminatory because it allowed planes that were equally noisy or noisier than Q707s to operate at the Airport and to increase in number without limit while excluding the Q707, based on a characteristic--date of type-certification as meeting Stage 2 requirements--that had no relationship to noise. The FAA denied San Francisco's grant applications and withheld approval of new grants while the regulation remained in effect. San Francisco petitioned for review in this court.
 
 II
 
 9
 We reject at the outset San Francisco's contention we should decide de novo as a matter of contract interpretation whether San Francisco violated its grant assurance. This contention misunderstands the nature of federal regulation of airport noise. It also misunderstands the role of the Airport and Airway Improvement Act, which denies federal funds to airport proprietors who exceed their regulatory authority by denying use of an airport on an unjustly discriminatory basis.
 
 
 10
 The federal government regulates aircraft and airspace pervasively, preempting regulation of aircraft noise by state or local governments. City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973). However, Congress reserved a limited role for local airport proprietors in regulating noise levels at their airports. See Santa Monica Airport Ass'n v. City of Santa Monica, 659 F.2d 100, 104 (9th Cir.1981) ("Congress intended that municipal proprietors enact reasonable regulations to establish acceptable noise levels for airfields and their environs."); see also City of Burbank, 411 U.S. at 635 n. 14, 93 S.Ct. at 1861 n. 14; San Diego Unified Port Dist. v. Gianturco, 651 F.2d 1306, 1316 (9th Cir.1981).
 
 
 11
 Congress made it clear, however, that the power delegated to airport proprietors to adopt noise control regulations is limited to regulations that are not unjustly discriminatory. When the Federal Aviation Act was amended in 1968 to extend the FAA's authority to regulate aircraft noise, the Senate Report accompanying the bill quoted with approval a letter from the Secretary of Transportation. The letter set forth the existing limited authority of airport proprietors to adopt nondiscriminatory noise regulations and stated that the 1968 amendment would not alter that limited authority:
 
 
 12
 the proposed legislation will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.
 
 
 13
 S.Rep. No. 1353, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News 2688, 2694.
 
 
 14
 Courts have recognized both the delegation of regulatory power to airport proprietors and the limitation of this power to the issuance of nondiscriminatory regulations. See City of Burbank, 411 U.S. at 635 n. 14, 93 S.Ct. at 1861 n. 14 (quoting the Secretary of Transportation's letter); British Airways v. Port Auth. of New York (Concorde I), 558 F.2d 75, 84 (2d Cir.1977) (a local airport proprietor "is vested only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs"); British Airways v. Port Auth. of New York, 564 F.2d 1002, 1011 (2d Cir.1977) (Concorde II ) (maintaining "a fair and efficient system of air commerce ... mandates that each airport operator be circumscribed to the issuance of reasonable, nonarbitrary and nondiscriminatory rules defining the permissible level of noise which can be created by aircraft using the airport").
 
 
 15
 Although Congress has revisited the issue of how best to control airport noise on a number of occasions, it has declined to alter the delegation to airport proprietors of the limited noise control authority described in the Secretary's 1968 letter. See S.Rep. No. 1160, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Admin.News 4655, 4663 (accompanying Noise Control Act of 1972) ("[t]his does not address responsibilities or powers of airport operators ..."); S.Rep. No. 52, 96th Cong., 2d Sess. 13 (1980), reprinted in 1980 U.S.Code Cong. & Admin.News 89, 101 (accompanying Aviation Safety and Noise Abatement Act of 1979) ("[N]othing in the bill is intended to alter the respective legal responsibilities of the Federal Government and local airport proprietors for the control of aviation noise.").[2]
 
 
 16
 The conditions Congress imposed on the grant to local airport proprietors of money from the Airport and Airway Trust Fund are designed in part to insure the maintenance of conditions essential to an efficient national air transport system, including access to airports on a reasonable and nondiscriminatory basis. Section 2210(a) of the Airport and Airway Improvement Act of 1982 requires the Secretary of Transportation to obtain certain assurances from airport proprietors as a condition of receiving a grant from the Fund. The first of these conditions is that the Secretary must
 
 
 17
 receive assurances in writing, satisfactory to the Secretary that--(1) the airport to which the project relates will be available for public use on fair and reasonable terms and without unjust discrimination....
 
 
 18
 49 U.S.C.App. § 2210(a)(1).[3] Grants must be offered upon terms and conditions the Secretary considers necessary to meet the requirements of the statute, 49 U.S.C.App. § 2211(a), and the Secretary may not approve a grant application unless the Secretary is satisfied that this and other requirements of the statute have been met. 49 U.S.C.App. § 2208(b)(1)(E).
 
 
 19
 Pursuant to this statutory scheme, San Francisco received grant offers requiring San Francisco to assure the Secretary, in language tracking the statute, that it would operate its Airport on a fair and reasonable basis and without unjust discrimination. A grant agreement based on such an offer is not an ordinary contract, but part of a procedure mandated by Congress to assure federal funds are disbursed in accordance with Congress' will. Whether San Francisco violated this assurance depends upon whether its regulation conflicted with the statutory condition imposed by section 2210(a)(1) and incorporated in the grant contract.[4]
 
 
 20
 While we review questions of statutory interpretation de novo, we accord substantial deference to the interpretation adopted by the agency charged with administering the statute. Utility Reform Project v. Bonneville Power Admin., 869 F.2d 437, 442 (9th Cir.1989). The FAA's interpretation of what constitutes unjust discrimination within the meaning of section 2210(a)(1) will be upheld unless it is unreasonable. See id. Deference is especially appropriate because Congress expressly mandated FAA enforcement of the statute by the Secretary (who delegated that duty to the Administrator) and, as the administrative record in this case demonstrates, application of the statute to airport noise regulations requires technical expertise.
 
 III
 
 21
 * The Administrative Law Judge found San Francisco had excluded the Q707 under the noise regulation because San Francisco had concluded the Q707 was noisier in takeoff than any other aircraft using the Airport. The ALJ found San Francisco's determination had been mistaken, and that other aircraft permitted to use the Airport under the regulation were as noisy or noisier than the Q707. The FAA Administrator stated:
 
 
 22
 [San Francisco] has apparently abandoned its contention that the aircraft's takeoff noise exceeded that of all other aircraft at [the Airport]. Indeed, [San Francisco] concedes the correctness of the Initial Decision's factual findings that during the period the Q707 has been denied permission to operate at the Airport, 15 other models of aircraft, emitting as much or more noise than the Q707, have been permitted to operate there; and that operators of these airlines have been permitted to increase the number of flights with these aircraft types. [San Francisco] also does not dispute that at least 560 takeoffs and landings are performed each month at [the Airport] by six aircraft models noisier than the Q707.
 
 
 23
 The factual assumption on which San Francisco denied a waiver to the Q707 was similarly mistaken. San Francisco based the denial on its conclusion the Q707 met Stage 2 standards through the use of thrust cutbacks and decibel tradeoffs, and would therefore be noisier in takeoff than all other aircraft at the Airport. The ALJ found, on substantial evidence, many aircraft models operating at the Airport, including aircraft models conducting more than half the departures from the Airport in 1985, also met Stage 2 requirements through the use of cutbacks and tradeoffs, and, as mentioned earlier, some of these planes were as noisy or noisier in takeoff than the Q707.
 
 
 24
 The Administrator approved the ALJ's holding that because San Francisco's noise regulation allowed planes that were equally noisy or noisier than Q707s to operate at the Airport and increase in number without limit, while excluding the Q707 based on a characteristic that had no bearing on noise (date of type-certification as meeting Stage 2 requirements), the regulation violated the requirement of section 2210(a)(1) and of San Francisco's grant assurance that the Airport would be available "without unjust discrimination." The Administrator noted
 
 
 25
 [e]xclusion of the Q707 based on the date of modification, rather than the date of complying operation is neither rational nor reasonable. The date of retrofit is irrelevant to the amount of noise an aircraft emits.
 
 
 26
 We are satisfied that the Administrator's interpretation of section 2210(a)(1), and therefore of the grant assurance, was reasonable. The Administrator held the
 
 
 27
 issue to be resolved was whether [San Francisco's] actions were discriminatory, as demonstrated by the evidentiary record and application of appropriate decisional law. In this respect, the ALJ's reliance on the Concorde Cases was proper.
 
 
 28
 We agree with the Administrator. The central issue was whether San Francisco's regulation was unjustly discriminatory within the meaning of the statute, and the Second Circuit's Concorde Cases were sound authority for the conclusion that it was.[5]
 
 
 29
 Concorde I recognized that the interest in a safe and efficient national air transport system reflected in the federal legislative scheme required that local airport proprietors exercise their power to control airport noise in a reasonable and nondiscriminatory fashion and in conformity with federal law, including specifically the requirement that airports be "available for public use on fair and reasonable terms and without unjust discrimination." 558 F.2d at 85. Concorde II applied this principle to enjoin an airport proprietor from further delaying access to its airport by a supersonic plane when the record established the supersonic plane satisfied the decibel-based noise standard applied by the airport proprietor to subsonic aircraft that were permitted to use the airport. The court stated the decision was based in part upon the court's obligation to enforce "the proprietor's observance of the strict statutory obligation to make his facility available for public use on fair and reasonable terms, and without unjust discrimination...." 564 F.2d at 1011.
 
 
 30
 In Concorde II, as in the present case, the action of an airport proprietor purporting to exercise delegated authority to regulate noise was held to constitute "unjust discrimination" within the meaning of the statute when the action resulted in denial of use of the airport to planes that met noise standards applied to other aircraft allowed use of the airport. Concorde II, 564 F.2d at 1012.[6]
 
 
 31
 In the present case, as in the Concorde Cases, use of noise control regulations by an airport proprietor to bar aircraft on a basis other than noise, or without a factual basis, was found to be inconsistent with a fair and efficient national air transport system. This test of "unjust discrimination" is a permissible construction of the language of section 2210(a)(1) and the policies it serves.
 
 
 32
 San Francisco argues its noise regulation is valid because San Francisco had a rational basis for believing the regulation would reduce Airport noise levels by eliminating the Q707, admittedly a noisy aircraft, and encouraging a shift to quieter Stage 3 aircraft. The argument rests in part upon the contention that equal protection law provided the appropriate test for evaluating the regulation, a contention the Administrator properly rejected. See supra note 5. Moreover, it was not unreasonable for the FAA to interpret the statute as requiring more than that San Francisco's regulation reduce noise, since the statute required the Airport be available "without unjust discrimination," a requirement obviously important to an efficient national air transport system dependent upon flights by particular aircraft to various airports along a national route. Exclusion of jet-propelled or supersonic aircraft would have reduced noise, yet the discriminatory exclusion of these planes was held to be beyond the power of local airport proprietors. See Santa Monica, 659 F.2d at 105; Concorde II, 564 F.2d at 1012.
 
 
 33
 San Francisco also argues it reasonably denied the Q707 a waiver because allowing Burlington's Q707s to operate would increase the cumulative noise level at the Airport by "opening the floodgates" to operations by Q707s owned by others as well as to other Stage 1 aircraft retrofitted after the cut-off date. Again, the FAA was not required to approve a discriminatory regulatory scheme simply because it may have had the effect of reducing noise. It was only because of the 1978 Regulation that the Q707 had to apply for a waiver in the first place; that San Francisco might find non-discriminatory grounds for barring the Q707 once the waiver stage was reached does not validate the discriminatory regulatory scheme itself.
 
 
 34
 San Francisco argues its 1978 regulation is a lawful exercise in "grandfathering" under New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), which rejected an equal protection challenge to a local regulation that banned pushcart vendors but exempted vendors who had operated eight years or more. See also Western Air Lines v. Port Auth. of New York, 817 F.2d 222, 226 (2d Cir.1987) affirming 658 F.Supp. 952, 959-60 (S.D.N.Y.1986) (upholding an exercise of "grandfathering" in airport regulation). The FAA questioned the applicability of Dukes to this case, which does not involve an equal protection challenge and does involve an explicit statutory prohibition against unjust discrimination. In any event, San Francisco's 1978 Regulation does not grandfather planes, but types of planes. The number of takeoffs and landings by aircraft as noisy or noisier than the Q707 at San Francisco Airport could actually increase rather than decrease as a result of the regulation, refuting the contention it was simply an exercise in "grandfathering."
 
 
 35
 San Francisco argues it cannot ban the noisiest types of aircraft from its Airport because five of the six models noisier than the Q707 are Boeing 747s, crucial for long-distance international travel, and it would be impractical and an undue burden on interstate commerce to ban them. Even if true, this would not justify exclusion of the Q707 on the basis of a factor--date of type-certification as meeting Stage 2 standards--unrelated to noise.
 
 B
 
 36
 San Francisco asserted a defense of impossibility to the allegation it had breached its grant assurances, claiming its noise regulation was necessary to comply with California law. California requires airport proprietors to meet certain noise standards or obtain a variance to continue operating. See Cal.Pub.Util.Code §§ 21661-669.6; 21 Cal.Code of Regulations §§ 5000-90. See also Air Transport Ass'n of America v. Crotti, 389 F.Supp. 58, 61-62 (N.D.Cal.1975) (describing California's regulatory scheme). In 1982 San Francisco obtained a variance from the California Department of Transportation requiring that San Francisco "not knowingly permit or authorize any activity in conjunction with the Airport which results in an increase of the size of the noise impact area...." The version of the variance still in force commits San Francisco to "continue reducing the number of dwelling units located within the 65 [decibel] or greater" range of the Airport. San Francisco argues that admitting the Q707 would violate the terms of this variance.
 
 
 37
 We reject San Francisco's suggestion that a state contract defense could authorize San Francisco to adopt a noise regulation prohibited by federal law. Assuming the contrary, however, there is no merit in the defense. As the FAA pointed out, San Francisco failed to show that admitting the Q707 would violate the variance. Moreover, we note that the 1978 Regulation was not the only method San Francisco might choose to comply with the variance; the Q707 could be barred from operating at the Airport if the regulation barring it was not unreasonably discriminatory.[7]
 
 C
 
 38
 In 1988, San Francisco adopted a new noise regulation requiring, effective in 1989, all carriers conduct at least 25% of their operations at the Airport with Stage 3 aircraft. Since Burlington has announced it will continue to use only Stage 2 aircraft, San Francisco argues the new regulation will prevent Burlington from operating at the Airport independently of the 1978 Regulation, and therefore, mooted any previous violation of San Francisco's assurance based on the 1978 Regulation.
 
 
 39
 Even if Burlington were to buy enough Stage 3 planes to comply with the 25% requirement, however, its remaining Q707s still would be excluded, while other operators combining "grandfathered" Stage 2 retrofits with Stage 3 aircraft would not be. Thus, San Francisco's regulatory scheme continues to discriminate against the Q707.
 
 
 40
 San Francisco argues Burlington failed to exhaust its administrative remedies by not seeking a waiver of the 1988 resolution. The FAA correctly concluded such an application would be futile: the same discrimination against the Q707 exists under the 1988 regulation as under the 1978 Regulation, for which a waiver was denied.
 
 IV
 
 41
 In 1987, Congress amended the Airport and Airway Improvement Act to impose a 180-day limit on the time the FAA may take to consider airport improvement grant applications. The amendment, codified at 49 U.S.C.App. § 2218(b)(1), provides:
 
 
 42
 The Secretary may not withhold approval of a grant application ... for a violation of an assurance or other requirement of this chapter unless--
 
 
 43
 (A) the Secretary provides the applicant with an opportunity for a hearing; and
 
 
 44
 (B) within 180 days after the date of such application or the date the Secretary first knows of such noncompliance, whichever is later, the Secretary makes a determination that the violation has occurred.
 
 
 45
 The parties agree the FAA did not deny or approve San Francisco's grant applications for fiscal years 1986 through 1989 within the mandated period. San Francisco argues the FAA is required by section 2218(b) to set aside the airport improvement funds at issue even if we uphold the FAA's decision that the noise regulation violates the statute and San Francisco's assurance. We agree in part.
 
 
 46
 The statutory language is mandatory, leaving the FAA no discretion. It compels timely approval or denial of grant applications. The House bill originally set the limit at 90 days. The Senate-House conference extended the deadline to 180 days with the stated expectation that the FAA "will adopt procedural schedules which will permit cases to be completed in 180 days, without depriving parties to the cases of procedural due process." H.R.Conf.Rep. No. 484, 100th Cong., 1st Sess. 69, reprinted in 1987 U.S.Code Cong. & Admin.News 2533, 2644. The purpose of the amendment can be inferred from the deadlines placed on appropriations of entitlement funds. If such funds are not obligated to an airport by the end of the second fiscal year following the final year to which the entitlement applies, the entitlement will lapse. See 49 U.S.C.App. § 2207(a). Delay in approving the grant application, or in administrative review of a denial, would put the funds in danger of lapsing without a final judgment that could be judicially reviewed. See City and County of San Francisco v. Engen, 819 F.2d 873, 875 (9th Cir.1987). Congress apparently sought to avoid this danger by mandating a prompt decision by the FAA.
 
 
 47
 The FAA argues the statute does not apply retroactively and so does not compel approval of grants for the years 1986 and 1987. San Francisco agrees, but notes it refiled the grant applications for these years after the statute was amended. The FAA points to no bar to refiling applications for previous years. We hold the refiled applications are subject to the 180-day limitation period in the same way as newly filed ones.
 
 
 48
 The FAA argues grant approval would be meaningless. Section 2218(b) allows the Administrator to continue to withhold already-obligated payments for another 180 days without a hearing or decision. The FAA argues it had a total of 360 days to decide whether or not to withhold payment, and met that deadline. It would be a "useless gesture," the FAA concludes, to order grant approval when the Administrator may refuse to pay.
 
 
 49
 We disagree with the FAA's reading of the statute. If Congress had wanted to establish a single 360-day period for grant approval and fund disbursement, it could easily have said so. This case does not require us to decide whether the FAA may decline to disburse the funds generated by the current grant applications, and we leave that question to another day.
 
 
 50
 Finally, the FAA argues San Francisco should be estopped from invoking the 180-day time limit because San Francisco's own refusal to abide by a tighter discovery schedule caused the delay. San Francisco presented evidence it proposed the discovery schedule in reliance on the FAA's representation the proceeding was not the required statutory "hearing" under section 2218(b). The FAA does not suggest the discovery proposal was improperly motivated. In any case, even under the FAA's proposed schedule, completion of the hearing and administrative appeal process within the required period would have been difficult if not impossible.
 
 
 51
 Although the FAA admits it failed to approve or deny San Francisco's fiscal year 1986 and 1987 applications within the statutory period, it argues its December 12, 1988 decision finding San Francisco in violation of grant assurances for the 1986 and 1987 fiscal years, and rejecting San Francisco's applications for these years and while the discriminatory regulation remained effective, disposed of the need to consider future grant applications until San Francisco cured the default. We agree. It would be a useless paper-shuffling for the FAA to respond each year to a grant request premised on identical circumstances as the grant request rejected the previous year. San Francisco was entitled to have its applications approved under the statute only for the 1986 and 1987 fiscal years.
 
 V
 
 52
 The County of San Mateo (San Mateo) appeals the ALJ's decision to deny it full intervenor status. San Mateo was not allowed to offer testimony, file motions, or participate in arguments and settlement negotiations, although it did file briefs and observe the proceedings. Intervention in FAA proceedings is permissive under FAA regulations if the intervenor "has a property or financial interest that may not be adequately represented" and "intervention will not unduly broaden the issues or delay the proceedings." 14 C.F.R. § 13.51 (1991). San Mateo's interest in this case stems from San Francisco International Airport's location in San Mateo County, and the effects of Airport noise on at least 20,000 County residents. The ALJ concluded San Francisco could adequately represent San Mateo's interest in enforcing the regulation.
 
 
 53
 San Mateo argues San Francisco could not adequately represent its interests because San Mateo and San Francisco Airport had been adversaries in previous state noise variance permit proceedings. However, the relevant consideration is whether the interests of the parties diverged in this proceeding, not in any other. See United States v. American Telephone and Telegraph Co., 642 F.2d 1285, 1293 (D.C.Cir.1980) (adequacy of representation must be assessed in relation to the specific purpose of intervention). San Francisco had the same incentive as San Mateo to support the 1978 noise regulation. It was not an abuse of discretion to deny San Mateo County more than limited intervention.
 
 VI
 
 54
 We affirm the FAA's determination that the 1978 Regulation violated San Francisco's grant assurance. We also affirm the FAA's decision that California was not a necessary party to the administrative proceeding, and the FAA's decision to deny San Mateo County full intervenor status. However, we direct the FAA to approve San Francisco's applications for fiscal years 1986 and 1987 because the FAA failed to comply with 49 U.S.C.App. § 2218(b).
 
 
 55
 AFFIRMED in part, REVERSED in part. Each party to bear its own costs on appeal.
 
 
 
 [1]
 The Chief Counsel alleged the exclusion violated other statutes, but these charges were later dismissed
 
 
 [2]
 Neither the FAA or this Court has considered whether the Airport Noise and Capacity Act of 1990, 49 U.S.C.App. §§ 2151-58, alters this division of responsibility since the Act was passed after the administrative proceedings were completed. We also note, but do not consider, Congress' 1990 declaration that the Airport and Airway Improvement Act "should be administered in a manner consistent with" the goal of "preventing unjust and discriminatory practices, including as they may be applied between category and class of aircraft." 49 U.S.C.A.App. § 2201(a)(5) (1991) (emphasis added)
 
 
 [3]
 The conditioning of federal grants to airport proprietors on assurances the airport will be available "for public use on fair and reasonable terms and without unjust discrimination" has a long history. The language in the present Act is taken directly from its predecessor, the Airport and Airway Development Act of 1970, Pub.L. No. 91-258, Title I, § 18, 84 Stat. 229 (1970), which continued the language from its predecessor, the Federal Airport Act, Pub.L. No. 79-377, § 11, 60 Stat. 176 (1946)
 
 
 [4]
 Because the relevant language in the 1982 airport improvement act and its 1970 predecessor is identical, see supra note 3, it is irrelevant whether the particular grant assurances at issue were made pursuant to one act or the other
 
 
 [5]
 The FAA Administrator rejected San Francisco's contention that the equal protection clause provides the measure of legality of San Francisco's noise regulation. San Francisco argued New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), provided the appropriate test. As the Administrator noted, however, New Orleans v. Dukes applies only when the Equal Protection Clause alone is invoked and not, as in this case, "when local regulation is challenged under the Supremacy Clause as inconsistent with relevant federal laws...." 427 U.S. at 304 n. 5, 96 S.Ct. at 2517 n. 5
 San Francisco's argument its exclusion of the Q707 was valid because it had a reasonable belief the Q707 was noisier than all other planes is based on its mistaken reliance on equal protection law and was properly rejected by the FAA. In any event, the ALJ found San Francisco did not have such a reasonable belief.
 
 
 [6]
 Similarly, in Santa Monica Airport Ass'n. v. City of Santa Monica, we struck down a ban on the operation of jet aircraft on the basis of noise under the commerce and equal protection clauses because the quality and quantity of noise emitted by the jets had no greater tendency to irritate and annoy than that emitted by permitted prop planes. Santa Monica, 659 F.2d 100, 105 (9th Cir.1981), affirming 481 F.Supp. 927, 943-44 (C.D.Cal.1979). Although the statutory prohibition against "unjust discrimination" was not applicable, the district court indicated it would have rejected an argument that "grant agreement rights and the Federal Aviation Act obligations are any broader or different than the constitutional issues." 481 F.Supp. at 946
 San Francisco's reliance on Global Int'l Airways v. Port Auth. of New York 727 F.2d 246 (2d Cir.1984) (Global I ), as support for its regulation is misplaced. Global I held airport proprietor noise regulations could be aimed at reducing cumulative noise levels rather than barring aircraft that exceeded a maximum decibel level, but also noted aircraft could only be denied use of an airport "on the basis of non-discriminatory noise criteria." Global I, 727 F.2d at 248. The court did not decide whether the noise regulation before it was unjustly discriminatory. See Global Int'l Airways v. Port Auth. of New York, 731 F.2d 127, 130 n. 1 (2d Cir.1984) (Global II ).
 
 
 [7]
 Because San Francisco was not required by California law to adopt its 1978 Regulation, the FAA correctly held California was not a necessary party to the administrative proceeding. California, as amicus curie, agrees California law did not subject San Francisco to inconsistent obligations and that California was not a necessary party. However, California urges us to reject language in the FAA Administrator's ruling that California's efforts at airport noise control through variances are preempted by federal law, arguing the Administrator's broad language about federal preemption stems from a misreading of our decision in San Diego Unified Port Dist. v. Gianturco, 651 F.2d 1306 (9th Cir.1981). Resolution of the issue is not necessary to our decision, and we decline to address it