137 F.3d 81
 NATIONAL HELICOPTER CORP. OF AMERICA,
Plaintiff-Appellee-Cross-Appellant,
v.
The CITY OF NEW YORK; The Council of the City of New York;
The City Planning Commission of the City of New York; The
New York City Economic Development Corporation,
Defendants-Appellants-Cross-Appellees.
 Dockets 97-7082, 97-7142.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 8, 1997.
Decided Feb. 17, 1998.
 
 Ellen S. Ravitch, New York City (Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, Stephen J. McGrath, Deborah Rand, New York City, of counsel), for Defendants-Appellants-Cross-Appellees.
 Donald W. Stever, New York City (Janis M. Meyer, Clarke Bruno, Daniel Altman, Dewey Ballantine, New York City, of counsel), for Plaintiff-Appellee-Cross-Appellant.
 Steven A. Mirmina, Washington, DC (Timothy M. Biddle, Lorraine B. Halloway, Crowell & Moring LLP, Washington, DC, of counsel), filed a brief for Amicus Curiae Helicopter Association International in support of Plaintiff-Appellee-Cross-Appellant.
 Before: WINTER, Chief Judge, NEWMAN, and CARDAMONE, Circuit Judges.
 Judge NEWMAN concurs in part and dissents in part in a separate opinion.
 CARDAMONE, Circuit Judge:
 
 
 1
 This case concerns Manhattan's East 34th Street Heliport (Heliport or facility). In May 1996 New York City's Economic Development Corporation (Economic Development Corporation or Corporation), the agency responsible for administering the City's heliports, issued a Request for Proposals (Request) seeking a new fixed-base operator for the Heliport. The Request imposed certain restrictions on the use of the Heliport based on City law. Plaintiff National Helicopter Corporation of America (National Helicopter or National), which had been the Heliport's fixed-base operator for the past 20 years, filed an action in the United States District Court for the Southern District of New York, challenging the validity of those restrictions on the grounds that the regulation of airports is a field preempted by federal law. On January 7, 1997 Judge Sonia Sotomayor granted in part and denied in part National Helicopter's motion seeking permanent injunctive relief. The defendant City of New York, its Council, Planning Commission, and Economic Development Corporation, appeal from that judgment. National Helicopter cross-appeals.
 
 BACKGROUND
 
 2
 Developers desiring to make use of City land must comply with New York City's Zoning Resolution, which "regulat[es] and restrict[s] the location of trades and industries and the location of buildings designed for specific uses within the City of New York, and for such purposes divid[es] the City into districts." New York City Zoning Resolution § 11-01. Certain uses, "whose location or control requires special consideration," are permitted only if they have been granted a special permit by the City Planning Commission (Planning Commission). Id. § 74-01. The construction and operation of a heliport is one such use requiring a special permit. Id. § 74-66. An applicant seeking to obtain a special permit must work through layers of agencies, departments, commissions and corporations that comprise the City bureaucracy. Such work is no sport for the short-winded.
 
 
 3
 When the City planned to develop a heliport on land it owned along the East River and adjacent to the F.D.R. Drive and 34th Street, it (through the Department of Marine and Aviation) applied for and in 1971 obtained from the Planning Commission a special permit to operate the Heliport for a term of five years. The facility, one of four public heliports in Manhattan, opened in 1972. National became its fixed-base operator in 1973 when it entered into a lease with the Department of Marine and Aviation for an initial term of 10 years.[1] National subsequently renewed its lease and remained the fixed-base operator until August 1997 when it was legally evicted, although it remains entitled to use the Heliport for helicopter flights.
 
 Prior Disputes Between the Parties
 
 4
 National's 20-plus-year relationship with the City has been far from harmonious. Each time a dispute has arisen, the parties have reached a settlement agreement committing National to perform certain obligations in exchange for continued permission to remain the Heliport's operator. Several of these settlement agreements are relevant to the issues now on appeal. The first agreement was executed in 1985, following a 1982 action brought by the City for National's failure to pay rent. The 1985 agreement required National to apply to the Planning Commission for a new special permit to allow for the continued operation of the Heliport because the City's original permit to operate the facility had expired in 1976. The City, in return, allowed National to renew its lease retroactively, enabling it to continue as the Heliport's fixed-base operator for a second period of ten years, effective October 4, 1983. In a subsequent 1989 settlement stipulation, the City agreed to extend National Helicopter's fixed-base operator lease until October 1995 and, in exchange, National Helicopter agreed to an 11 p.m. to 7 a.m. curfew of its operations.
 
 
 5
 Pursuant to the 1985 settlement agreement and as part of the special permit application process, National was required to prepare an Environmental Impact Statement (EIS) to assess the Heliport's effect on its surrounding environment. National hired Young Environmental Services to do this work, but Young had failed to complete the project by 1993. Following another rent dispute, the Economic Development Corporation (successor to the Department of Marine and Aviation and its successor, the Department of Ports and Trade), as the current agency in charge of administering the City-owned heliports, assumed responsibility for completing the EIS. National agreed to reimburse the City for its costs.
 
 
 6
 Another rent dispute developed in 1993, causing the City to serve a notice of termination of National's fixed-base operator lease because National had not made the agreed-upon rental payments spelled out in a prior settlement. In response, National filed an action against the City in New York State Supreme Court seeking a stay of eviction. The parties resolved this dispute in a series of settlements commencing on January 10, 1994. The final such settlement, entered on February 13, 1996, provided that the City would allow National to continue its occupancy of the Heliport on a month-to-month basis until July 31, 1996 at which time the City could eject National pursuant to an executed Order of Ejectment. National Helicopter further agreed to waive any claims that were or could have been raised in its state court action against the City.
 
 The Special Permit Application
 
 7
 Meanwhile, on June 29, 1995 the Economic Development Corporation and the Department of Business Services, as co-applicants, filed with the Planning Commission an application for a special permit to allow for the continued operation of the Heliport. The agencies' application discussed their proposal to attain the City's goals of redistributing sightseeing flights away from the Heliport to other City heliports by restricting tourist operations to Saturday and Sunday flights only and limiting the number of flights to a maximum of four per hour during a 12-hour operating day. The agencies hoped that these restrictions would reduce total operations at the Heliport by 47 percent.
 
 
 8
 Under New York City law, before the Planning Commission may award a special permit, the affected community boards, the borough president, the New York City Council, and the public must review the significant land use decision. See New York City Charter § 197-c. Pursuant to this review procedure, the Planning Commission certified the agencies' application, including a draft EIS, as complete on August 7, 1995. The Planning Commission referred the application to Manhattan Community Board 6 and the Manhattan borough president for consideration. Both opposed the application unless various conditions--including a curfew and the prohibition of weekend sightseeing operations--were met. On November 29, 1995 the City Planning Commission conducted a public hearing to consider comments from the affected community board, representatives of New York University's medical facilities located near the Heliport, and other community members.
 
 
 9
 The final EIS, issued on December 27, 1995, evaluated noise data measured at seven receptor sites surrounding the Heliport. It considered the impact of a 47 percent reduction in operations, as discussed in the application for the special permit, and concluded that the proposed reduction would decrease noise levels, both in magnitude and significant impact.
 
 
 10
 On January 9, 1996 the City Planning Commission recommended awarding the special permit to the Economic Development Corporation and the Department of Business Services for a period of ten years and subject to a variety of restrictions. On March 6, 1996 following a public hearing addressing the City Planning Commission's recommendations, the City Council enacted Resolution 1558, approving the issuance of the special permit, subject to the following conditions: (1) the restriction of weekday operations to between 8 a.m. and 8 p.m.; (2) the restriction of weekend operations to between 10 a.m. and 6 p.m.; (3) the phasing out of weekend operations entirely; (4) the reduction of operations by a minimum of 47 percent overall; (5) the barring of Sikorsky S-58Ts, or helicopters of a similar size, from use of the Heliport for sightseeing operations; (6) the prohibition of sightseeing flights over Second Avenue and the requirement that such flights heading north and south fly only over the East and Hudson Rivers; and (7) the requirement that helicopters using the Heliport be marked for identification from the ground. The Economic Development Corporation incorporated these conditions into its May 6, 1996 Request seeking a new fixed-base operator for the facility.
 
 
 11
 On May 15, 1996 National filed its first amended complaint in the district court seeking to enjoin the conditions imposed by the City Council's Resolution 1558. Although National originally moved for a preliminary injunction, the parties consented to stay the enforcement of Resolution 1558 and suspend the Request until the court rendered a final judgment on the merits.
 
 The District Court's Decision
 
 12
 In an opinion entered January 7, 1997 Judge Sotomayor permanently enjoined the City from enforcing all but two of Resolution 1558's provisions. National Helicopter Corp. v. City of New York, 952 F.Supp. 1011 (S.D.N.Y.1997). She first determined that National had not waived its right to challenge conditions adopted in connection with the Council's special permit when it signed the February 1996 stipulation. Id. at 1021-22. Next, the district court, although generally recognizing federal preemption over the regulation of aircraft and airspace, observed that municipalities that are proprietors of local airports--like the City with respect to this Heliport--may regulate an airport's noise levels in a "reasonable, nonarbitrary and non-discriminatory" manner. Id. at 1026 (quoting British Airways Bd. v. Port Auth. of N.Y. and N.J., 558 F.2d 75, 84 (2d Cir.1977) (Concorde I)). With that standard in mind, the district judge upheld the weekday and weekend curfews (conditions # 1 and # 2) as reasonable regulations of noise at the Heliport. Conversely, she determined that the other conditions exceeded the scope of the City's authority pursuant to the proprietor exception, and permanently enjoined their enforcement. Id. at 1026-32.
 
 ANALYSIS
 I Threshold Matters
 A. Standing
 
 13
 Before turning to the merits, we must first dispose of two threshold matters: standing and waiver. The City maintains that National does not have standing to challenge the conditions imposed in Resolution 1558 and the Request. It also maintains that even if appellant has standing to challenge the Resolution's conditions, it has waived its rights to challenge them.
 
 
 14
 We address the standing issue first. The basis for the City's standing argument is that because National does not have a valid expectation of becoming the Heliport's next fixed-base operator, it lacks sufficient interest in the controversy regarding the City regulation to challenge it. See Sierra Club v. Morton, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972) (explaining that standing addresses the question "[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy"). National's interest, as the district court recognized, extends beyond its status as a fixed-base provider; it may operate as a user of the Heliport in the future. 952 F.Supp. at 1019-20. The conditions of the City's Resolution, if enforced, would seriously impact National's business, both as an operator and as a user.
 
 
 15
 We are unable to agree with the City's view of the Request to the extent it asserts that certain conditions, i.e., the ban on the Sikorsky S-58T helicopter, the sightseeing route restriction, and the markings requirement, only apply to a fixed-base operator. The Request states that those conditions apply to "all sightseeing helicopter service providers based at the [Heliport]" and defines such providers as companies that have subcontracted with the fixed-base operator to base their operations at the Heliport. National Helicopter, even if it was not granted fixed-base operator status, could subcontract with the fixed-base operator to base its operations at the facility. Thus, National has a sufficient stake in the resolution of this controversy to give it standing.
 
 B. Waiver
 
 16
 Turning to the alleged waiver, the City asserts that National is precluded from challenging Resolution 1558's conditions because it bargained away that right when it executed the February 13, 1996 stipulation. The stipulation contained a clause in which National waived any and all claims with respect to the Economic Development Corporation's "acts or omissions regarding the EIS ..., the [land use review] application, or any conditions relating to the special permit required under the City's Zoning Resolution."
 
 
 17
 A release freely entered into that clearly waives a right to pursue a cause of action is binding. See National Union Fire Ins. Co. v. Woodhead, 917 F.2d 752, 757 (2d Cir.1990); Bank of America Nat'l Trust & Sav. Assoc. v. Gillaizeau, 766 F.2d 709, 713 (2d Cir.1985). But a release should not be read to include matters of which the parties had no intention to dispose. Lefrak SBN Assocs. v. Kennedy Galleries, Inc., 203 A.D.2d 256, 257, 609 N.Y.S.2d 651 (2d Dep't 1994); see also Gettner v. Getty Oil Co., 226 A.D.2d 502, 503, 641 N.Y.S.2d 73 (2d Dep't 1996) (stating that the "meaning and coverage of a release depends on the controversy being settled"); East 56th Plaza, Inc. v. Abrams, 91 A.D.2d 1129, 1130, 458 N.Y.S.2d 953 (3d Dep't 1983) ("This intent must be clearly established and cannot be inferred from doubtful or equivocal ... language, and the burden of proof is on the person claiming the waiver of the right.").
 
 
 18
 Reading the waiver language in its entirety, and considering the controversy being settled, it is far from evident that National intended to release the City for claims regarding conditions that may have been imposed upon the special permit the City Council had not yet granted. The waiver that plaintiff signed concerned only claims regarding the requirement of a special permit and the manner in which the Economic Development Corporation pursued it. National therefore could not challenge the application process undertaken by the Economic Development Corporation as improper under City law, i.e., the Zoning Resolution and the City Charter, but it could pursue a substantive claim that the conditions ultimately imposed by the City Council violate federal law. Cf. Summit School v. Neugent, 82 A.D.2d 463, 468, 442 N.Y.S.2d 73 (2d Dep't 1981) (requiring the narrow interpretation of waivers where matters of public policy are concerned).
 
 II The Proprietor Exception
 
 19
 We now address the merits of the controversy. National contends that the conditions imposed under Resolution 1558 and the Request are defective because they are preempted by federal law. The City, on the other hand, avers that it carefully assessed and imposed all the conditions pursuant to its power as the proprietor of the Heliport.
 
 
 20
 The Supremacy Clause of the United States Constitution invalidates state and local laws that "interfere with or are contrary to, the laws of congress." Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). Congress preempted state and local regulations "related to a price, route or service of an air carrier" when it passed § 1305(a) of the Airline Deregulation Act, now recodified at 49 U.S.C. § 41713(b)(1) (1994). Cf. id. § 40101, et seq. (1994) (Federal Aviation Act); id. § 44715 (1994) (Noise Control Act); id. § 47521, et seq. (1994) (Airport Noise and Capacity Act) (acts implying preemption of noise regulation at airports).
 
 
 21
 In enacting the aviation legislation, Congress stated that the preemptive effect of § 1305(a) did not extend to acts passed by state and local agencies in the course of "carrying out [their] proprietary powers and rights." Id. § 41713(b)(3). Under this "cooperative scheme," Congress has consciously delegated to state and municipal proprietors the authority to adopt rational regulations with respect to the permissible level of noise created by aircraft using their airports in order to protect the local population. See Concorde I, 558 F.2d at 83-84 (discussing the 1968 amendment to Federal Aviation Act and Noise Control Act legislative history in which Congress specifically reserved the rights of proprietors to establish regulations limiting the permissible level of noise at their airports); S.Rep. No. 96-52, at 13 (1980), reprinted in 1980 U.S.C.C.A.N. 89, 101 (proclaiming that the Aviation Safety and Noise Abatement Act was not "intended to alter the respective legal responsibilities of the Federal Government and local airport proprietors for the control of aviation noise"); cf. City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633, 635-36 n. 14, 93 S.Ct. 1854, 1859, 1860-61 n. 14, 36 L.Ed.2d 547 (1973) (acknowledging that while the federal government has "full control over aircraft noise, pre-empting state and local control" under their police power, the "authority that a municipality may have as a landlord is not necessarily congruent with its police power").
 
 
 22
 Hence, federal courts have recognized federal preemption over the regulation of aircraft and airspace, subject to a complementary though more "limited role for local airport proprietors in regulating noise levels at their airports." City and County of San Francisco v. F.A.A., 942 F.2d 1391, 1394 (9th Cir.1991). Under this plan of divided authority, we have held that the proprietor exception allows municipalities to promulgate "reasonable, nonarbitrary and non-discriminatory" regulations of noise and other environmental concerns at the local level. Concorde I, 558 F.2d at 84 (regulations of noise levels); see also Western Air Lines, Inc. v. Port Auth. of N.Y. and N.J., 658 F.Supp. 952, 957 (S.D.N.Y.1986) (permissible regulations of noise and other environmental concerns), aff'd, 817 F.2d 222 (2d Cir.1987).
 
 
 23
 National does not dispute the viability of the proprietor exception. It maintains instead that the City, in enacting Resolution 1558, did not act in its proprietary capacity, but rather under its police power, and therefore is not entitled to rely on the proprietor exception. As a result, the conditions the resolution imposed, it continues, are presumptively invalid. See City of Burbank, 411 U.S. at 633, 635-36 n. 14, 93 S.Ct. at 1859, 1860-61 n. 14 (invalidating curfew on airport operations imposed pursuant to city's police power); San Diego Unified Port Dist. v. Gianturco, 651 F.2d 1306, 1315 n. 22 (9th Cir.1981) (listing cases invalidating curfews imposed pursuant to municipalities' police power).
 
 
 24
 The Economic Development Corporation, acting in a proprietary capacity, was extensively involved in the permit application process and issued the Request. It proposed to change operations at the Heliport by reducing operations by 47 percent and imposing a curfew. Since there was participation by a number of different City agencies in the permit process, some acting as owner, e.g., the Economic Development Corporation, some as protectors of the public, e.g., the City Planning Commission, we think the City acted in both a proprietary and a police capacity when it imposed the conditions upon the special permit. The proprietor exception is accordingly applicable to our evaluation of Resolution 1558 and the Request. See United States v. State of New York, 552 F.Supp. 255, 264 (N.D.N.Y.1982) (reasoning that a curfew imposed by the State of New York pursuant to its police and proprietary powers was entitled to analysis under the proprietor exception), aff'd per curiam on other grounds, 708 F.2d 92 (2d Cir.1983).
 
 III The Reasonableness of the Restrictions
 
 25
 As a proprietor, the City, as noted, has the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations. Those regulations must avoid even the appearance of irrational or arbitrary action. See British Airways Bd. v. Port Auth. of N.Y. and N.J., 564 F.2d 1002, 1005 (2d Cir.1977) (Concorde II). Further, the City may regulate only a narrowly defined subject matter--aircraft noise and other environmental concerns at the local level. See Western Air Lines, 658 F.Supp. at 957.
 
 
 26
 The City asserts that all seven of the conditions imposed upon the special permit fall within its power under the proprietor exception. It contends the district court erred when it permanently enjoined five of those conditions (conditions # 3-7). National counters that it was error not to strike all seven conditions. We review orders granting or denying injunctive relief for an abuse of discretion. See Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir.1993) ("Abuse of discretion can be found if the district court relied upon a clearly erroneous finding of fact or incorrectly applied the law."). With this in mind, we analyze in order the conditions imposed.
 
 
 27
 Weekday and Weekend Curfews (Conditions # 1 and # 2)
 
 
 28
 We agree with the district court that the weekday and weekend curfews imposed should be upheld. The protection of the local residential community from undesirable heliport noise during sleeping hours is primarily a matter of local concern and for that reason falls within the proprietor exception. See Santa Monica Airport Ass'n v. City of Santa Monica, 481 F.Supp. 927, 938-39 (C.D.Cal.1979), aff'd, 659 F.2d 100 (9th Cir.1981); see also Concorde I, 558 F.2d at 83 ("It is perhaps more important ... that the inherently local aspect of noise control can be most effectively left to the operator, as the unitary local authority who controls airport access.").
 
 
 29
 We note that at least two district court decisions in this Circuit have enjoined curfews. See United States v. County of Westchester, 571 F.Supp. 786, 797 (S.D.N.Y.1983) (enjoining curfew on all night flight operations at airport imposed regardless of accompanying emitted noise as unreasonable, arbitrary, discriminatory and overbroad); State of New York, 552 F.Supp. at 265 (enjoining night-time curfew on all aircraft, regardless of decibel level emitted by individual aircraft, as "overbroad and constitutionally impermissible in view of federal pre-emption of regulations concerning noise and planes in flight"). To the extent that these decisions have stricken curfews for their failure to target the noisiest aircraft or the noisiest times of operation, they have since been overturned by our opinion in Global Int'l Airways Corp. v. Port Auth. of N.Y. & N.J., 727 F.2d 246, 251 (2d Cir.1984), which permits proprietors to reduce cumulative noise levels, as opposed to only targeting peak noise levels or the noise level produced by an individual aircraft.
 
 
 30
 Elimination of Weekend Operations (Condition # 3)
 
 
 31
 We are unable to sustain the district court's enjoining of condition # 3, which eliminated weekend operations at the Heliport, for reasons similar to those just stated with respect to conditions # 1 and # 2. The regulation requiring the facility's operator to phase out operations on Saturdays and Sundays is based on the City's desire to protect area residents from significant noise intrusion during the weekend when most people are trying to rest and relax at home. We agree with those courts that have held such reasoning as ample justification for the application of the proprietor exception. See Santa Monica Airport Ass'n, 481 F.Supp. at 939 (recognizing that "the interest being protected, the minimization of noise during the weekend hours when the need for leisure and rest in the residential community is the highest, is a matter of peculiar local concern" and upholding a weekend ban on touch-and-go, stop-and-go and low approach operations).
 
 
 32
 We find such a restriction to be reasonable and not arbitrary. See Concorde I, 558 F.2d at 84. The fact that the Economic Development Corporation's proposal, on which the EIS is based, contemplated shifting sightseeing operations from weekdays to the weekend does not alter this conclusion. The Corporation determined, and the EIS confirmed, that the Heliport was a source of excessive noise. That is a sufficient basis on which a proprietor may impose a weekend curfew.
 
 
 33
 The Reduction of Operations by 47 Percent (Condition # 4)
 
 
 34
 The City conditioned the continuation of operations at the Heliport on an overall 47 percent reduction in those operations, despite the fact that the specific percentage reduction was based on a scenario different from the one envisioned by the Economic Development Corporation when it filed the permit application and proposed the 47 percent reduction. In its application, the Corporation proposed limiting flights to four per hour, operating only a 12-hour day, and ceasing tourist flights during the work week. Those changes, the Corporation estimated, would reduce operations at the Heliport by 47 percent. By the time the application emerged from the land use review process, however, the permit required the cessation of sightseeing operations during the weekend instead of during the work week, but still mandated a reduction in operations of 47 percent.
 
 
 35
 The district court held that the 47 percent reduction was arbitrary and unreasonable because, based in part on the shift in approach, there was no evidence that it was "in any way calibrated to achieve any particular noise based result." 952 F.Supp. at 1029. While we agree that the mandated 47 percent reduction in operations was not backed by any study reflecting the appropriate scenario or demonstrating that such specific percentage of noise reduction was the ideal, we also believe that the proprietor was entitled to eliminate a portion of the Heliport's operations upon reaching a conclusion that a problem of excessive noise existed. Based on the EIS's conclusion that a 47 percent reduction in operations would result in a substantial noise reduction at the Heliport, we believe that, in this case, the relevant condition was reasonable.
 
 
 36
 In Western Air Lines, 658 F.Supp. at 953, the court evaluated the "perimeter rule" that the New York and New Jersey Port Authority had imposed at LaGuardia Airport, forbidding airlines from conducting nonstop flights beyond 1,500 miles in and out of the airport. The Port Authority had conducted a study of LaGuardia's capacity, circulated questionnaires to interested parties (e.g., airlines, the Federal Aviation Administration, the Department of Transportation), and determined that the perimeter rule was necessary to combat the airport's congestion problem. Id. at 959-60. The district court upheld the Port Authority's action as reasonable. Id. at 960 ("[T]his Court will not second guess the actions of the Port Authority as long as they are reasonable.").
 
 
 37
 Just as the evidence supported LaGuardia's "perimeter rule," the EIS prepared by the City supports the proposition that the elimination of 47 percent of the Heliport's operations will result in a significant reduction in the noise emitted from it. We do not believe the change in the approach for reducing the facility's operation alters such a conclusion. Recognizing there was too much noise at the Heliport, the City determined that curtailing a significant portion of its operations would reduce noise levels. It is unrealistic to insist that a proprietor justify by some scientific method a specific percentage reduction in operations in order to achieve the general result of a reduction of excessive noise.
 
 
 38
 Moreover, we find it difficult to imagine how whatever percentage that is chosen--whether it is 15, 25, or 47 percent--would not be considered arbitrary. Thus, we believe the EIS adequately supports the conclusion that a 47 percent reduction in operations will improve the environmental quality of the Heliport's surrounding areas, however that reduction may be determined. For example, it may be pursuant to a curfew, a per hour limit, or a curtailment of operations, and so long as the mandated reduction is nonarbitrary and sufficiently reasonable a court may uphold the City's power to enforce such restriction. See Global Int'l Airways Corp., 727 F.2d at 251 (affirming a restriction targeting cumulative noise level based on the "reasonable prospect of a beneficial effect").
 
 
 39
 We also reject National's argument that the restrictions adopted pursuant to the EIS are unreasonable because of the EIS' flawed nature. We do not require that studies offered as empirical support for a proprietor's actions be conducted pursuant to any one specific methodology, accepted in scientific communities as the most appropriate way of conducting an analysis. Rather, the test is one of reasonableness. The EIS at issue was prepared by an environmental sciences company, initially hired by National, with experience in heliports, assessing environmental impacts, and planning airport noise compatibility. Its noise analysis was based on data received from seven receptor sites surrounding the Heliport. We conclude that the empirical support for the relevant conditions contained in the EIS is reasonable and therefore sufficient for preemption analysis purposes. The district court consequently abused its discretion when it enjoined the enforcement of condition # 4.
 
 
 40
 Prohibition on Certain Helicopters (Condition # 5)
 
 
 41
 The City urges that the prohibition on Sikorsky S-58Ts and other helicopters of a similar size is reasonable because they are the noisiest aircraft using the Heliport. Although the proprietor exception allows reasonable regulations to protect against excessive noise, that power may not be used to discriminate. See Concorde II, 564 F.2d at 1012-13 (dissolving ban on flights of supersonic jet Concorde). In this case, the City placed restrictions on certain aircraft because of their size--not the noise they make--despite evidence that larger helicopters are not necessarily noisier than smaller ones. A regulation purporting to reduce noise cannot bar an aircraft on any other basis. See City and County of San Francisco, 942 F.2d at 1398 (analyzing Concorde I and Concorde II and holding that airport proprietor's regulation banning retrofitted aircraft from operating at airport was unjust discrimination). The City's ban on the Sikorsky S-58T and other helicopters of that size is unreasoned discrimination on account of an aircraft's size. Hence, the district court's enjoining of this condition was not an abuse of its discretion. Because this condition of the Resolution must be stricken on preemption grounds, we need not reach or decide National's equal protection argument.
 
 
 42
 Restrictions on Sightseeing Routes (Condition # 6)
 
 
 43
 The City claims the invasive nature of helicopter noise justifies the condition restricting sightseeing routes to the East River and the Hudson River. This argument, as the trial court recognized, evidences a misunderstanding of federal aviation law. Congress, the Supreme Court, and we have consistently stated that the law controlling flight paths through navigable airspace is completely preempted. See, e.g., Concorde I, 558 F.2d at 83 ("[L]egitimate concern for safe and efficient air transportation requires that exclusive control of airspace management be concentrated at the national level."); City of Burbank, 411 U.S. at 626-27, 93 S.Ct. at 1856-57 (recognizing the federal government's possession of exclusive national sovereignty in U.S. airspace); 49 U.S.C. § 40103(a)(1) (stating that the federal government has "exclusive sovereignty of airspace of the United States"). The proprietor exception, allowing reasonable regulations to fix noise levels at and around an airport at an acceptable amount, gives no authority to local officials to assign or restrict routes. As a result, the City unlawfully intruded into a preempted area when it curtailed routes for the flights of certain Heliport aircraft. This condition was properly enjoined.
 
 The Markings Requirement (Condition # 7)
 
 44
 Because we affirm the district court's injunction of the route mandate, the condition that helicopters using the facility be marked for identification from the ground, which exists solely to enforce the route requirement, becomes moot. Moreover, the condition interferes with the Federal Aviation Administration's duty to "prescribe air traffic regulations ... for ... identifying aircraft." 49 U.S.C. § 40103(b)(2). The district court did not abuse its discretion when it enjoined the markings requirement.
 
 IV The Commerce Clause
 
 45
 Finally, we turn to National's declaration that the conditions in Resolution 1558 and the Request violate the Commerce Clause of the U.S. Constitution. Congress approved the proprietor exception. Consequently, any action the City properly conducted pursuant to its powers as a proprietor cannot violate the Commerce Clause. See White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983) ("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce.").
 
 CONCLUSION
 
 46
 For the foregoing reasons, the City may not be enjoined from imposing weekday and weekend curfews. Insofar as the judgment appealed from refused to enjoin these curfews, it is affirmed. Insofar as the judgment appealed from enjoined the City from enforcing the designation of sightseeing routes, markings requirement, and prohibition of Sikorsky S-58T and other similar sized aircraft, it is also affirmed. Insofar as the judgment appealed from enjoined the elimination of weekend operations and the 47 percent mandatory reduction in operations, it is reversed and the injunction vacated.
 
 
 47
 Accordingly, the judgment appealed from is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 48
 JON O. NEWMAN, Circuit Judge, concurring in part and dissenting in part:
 
 
 49
 I concur in all aspects of the Court's opinion except the approval of the condition of the special permit that requires a 47 percent reduction in the operations of the East 34th Street Heliport. As to that condition, I agree with the District Court that the 47 percent figure, indisputably derived from circumstances no longer applicable, is arbitrary and unreasonable, and that the condition requiring this percentage reduction should be enjoined.
 
 
 50
 We all agree with the legal proposition that local airport proprietors are entitled to promulgate "reasonable" and "nonarbitrary" regulations to reduce noise levels. See British Airways Board v. Port Authority of New York and New Jersey, 558 F.2d 75, 84 (2d Cir.1977). We also agree with the factual proposition that a 47 percent reduction in operations will reduce noise levels. For the Court, those two propositions are the end of the matter; for me, they are only the beginning. The fact that a selected percentage of reduced operations will result in reduced noise levels cannot possibly be sufficient to establish that the particular percentage was selected in a reasonable and nonarbitrary manner. For example, if the decision-makers picked the percentage number by throwing a dart at a display of numbers from 1 to 100, use of the particular number hit would be manifestly arbitrary, despite the resulting lowering of noise levels from reduced operations. So would a number derived from the average of the ages of the decision-makers.
 
 
 51
 Of course, the arbitrariness of a percentage selected on a demonstrably arbitrary basis, i.e., one with no rational relationship to the regulatory purpose, does not necessarily mean that a percentage is reasonable only if supported by scientific analysis. Though an analysis of decibel levels, actual or potential injuries to eardrums, and degree of harm likely to be avoided by particular degrees of reduction in operations would provide an especially reasonable basis for selecting a required percentage reduction, I agree with the Court that a scientific study is not required for a reasonable decision. When dealing with something as intangible as annoyance from aircraft noise, regulators are entitled to exercise their judgment, on some reasonable basis, in determining the degree of noise reduction they choose to require.
 
 
 52
 Moreover, though a reasonably selected percentage reduction in noise level would be preferable, I am willing to assume, at least for the argument, that a city acts reasonably when it requires a reasonable reduction in aircraft operations in the expectation that the reduction in operations will result in reduction in noise level. See Global International Airways Corp. v. Port Authority of New York and New Jersey, 727 F.2d 246, 251 (2d Cir.1984) (regulation upheld because of "reasonable prospect" that it would have beneficial effect on noise level).[1] But the selection of the percentage of reduction in operations must nonetheless be reasonable. If the number selected here, 47, were viewed in isolation, the inference would be available, if not irresistible, that the number was selected arbitrarily, at least in the absence of some indication of a reasonable basis for selecting that number.[2] But in this case, the record indisputably reveals the source of the number 47. It is the percentage by which operations would have been reduced if, as contemplated by the permit application, sightseeing flights from the East 34th Street Heliport were prohibited during weekdays. However, the City's final requirements dropped the prohibition on weekday sightseeing flights and replaced it with a prohibition on weekend sightseeing flights. Nevertheless, the City required the same 47 percent reduction in operations that would have resulted from a prohibition that is no longer applicable. The number is the expected result of an abandoned proposal; it is not the product of the exercise of any judgment on the part of the City's decision-makers.
 
 
 53
 The majority properly notes that "the proprietor was entitled to eliminate a portion of the Heliport's operations upon reaching a conclusion that a problem of excessive noise existed." 137 F.3d at 90. It then states, "Based on the EIS's conclusion that a 47 percent reduction in operations would result in a substantial noise reduction at the Heliport, we believe that, in this case, the relevant condition was reasonable." Id. With deference, I do not believe that the EIS's conclusion provides a proper basis for the Court to determine that the 47 percent figure remains reasonable, once the factual predicate on which it was based (banning weekday sightseeing flights) has been abandoned.
 
 
 54
 The EIS was entitled to conclude that a 47 percent reduction in operations would result in a "substantial" noise reduction. It would have been equally entitled to conclude that an operations reduction of 46, 48, or 49 percent (or likely any number above 10, or perhaps 20) would also have resulted in a "substantial" noise reduction. But the undeniable fact is that the City's decision-makers have required use of the 47 percent figure for no reason other than its equivalence to the percentage of operations reduction that would have resulted from a now abandoned prohibition. Upholding use of the 47 percent figure because it, like many other numbers, will yield a substantial noise reduction replaces reasoned decision-making with coincidence. The record provides no reasoned explanation as to why the 47 percent number remains reasonable, and demonstrably reveals why its selection is unreasonable.
 
 
 55
 For these reasons, I respectfully dissent in part.
 
 
 
 [1]
 The lease was actually executed between the Department of Marine and Aviation and Island Helicopters, Inc., a wholly-owned subsidiary of National Helicopter. For the sake of simplicity, we refer to actions taken by both Island Helicopters and National Helicopter as having been taken by National Helicopter
 
 
 [1]
 The relationship between the regulation of operations and the resulting reduction in noise level was far more direct in Global than in the pending case. In Global, the regulation specified percentages of "noise compliant airplanes" that operators of heavy subsonic jets must use in each calendar quarter. See Global, 727 F.2d at 249-50. In the pending case, there is only a percentage reduction of all operations
 
 
 [2]
 Though the issue does not arise on this appeal, I think there would be a plausible argument that the selection of a number representing a familiar fraction, e.g., 50 percent for one half, or 33 1/3 percent for one third, would be reasonable since it would represent the decision-makers' intuitive guess as to the general degree of reduction (whether of noise or operations) they wished to require. But it cannot be seriously maintained that the decision-makers arrived at the number 47 by making even an intuitive guess