REVISED - March 27, 2000

# UNITED STATES COURT OF APPEALS
## FIFTH CIRCUIT

---

No. 99-60008

---

AMERICAN AIRLINES, INCORPORATED; CITY OF DALLAS, TEXAS; SOUTHWEST AIRLINES COMPANY; LOVE FIELD CITIZENS ACTION COMMITTEE,

Petitioners,

versus

DEPARTMENT OF TRANSPORTATION,

Respondent.

---

No. 99-60239

---

THE CITY OF FORT WORTH; DALLAS-FORT WORTH INTERNATIONAL AIRPORT BOARD,

Petitioners,

versus

DEPARTMENT OF TRANSPORTATION,

Respondent.

---

Petitions for Review of an Order of the
U.S. Department of Transportation

---

February 1, 2000

Before DUHÉ, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

This consolidated appeal involves respondent Department of Transportation's ("DOT's") interpretation of federal law governing airline service at Love Field airport. Petitioners Dallas-Fort Worth International Airport Board ("DFW Board"), City of Fort Worth ("Fort Worth"), American Airlines, Inc. ("American"), City of Dallas ("Dallas"), Southwest Airlines Company ("Southwest"), and Love Field Citizens Action Committee (the "Committee") petition for review of DOT's declaratory, procedural, and reconsideration orders. Legend Airlines, Inc. ("Legend"), Continental Airlines, Inc. ("Continental") and Continental Express, Inc. ("Continental Express") have intervened. For the reasons set forth below, we affirm.

**I**

Prior to 1968, Dallas and Fort Worth operated independent and competing airports. One of Dallas's airports was Love Field. DOT's predecessor agency, the Civil Aeronautics Board ("CAB"), found that the competition between Dallas's and Fort Worth's airports was harmful. Accordingly, in 1964 CAB ordered the cities to build a jointly-operated airport that would serve as the region's primary airport. The cities responded by creating the DFW Board and by jointly adopting the 1968 Regional Airport Concurrent Bond Ordinance (the "Ordinance"). The Ordinance authorized the issuance of bonds to finance the Dallas-Fort Worth Airport ("DFW"). Of critical importance here is section 9.5 of the Ordinance, which contained the cities' agreement to "take such steps as may be necessary, appropriate and legally permissible . . . to provide for the orderly, efficient and effective phase-out at Love Field, Redbird, GSIA and Meacham Field, of any and all Certificated Air Carrier Services, and to transfer such activities to the [DFW] Regional Airport."

The eight CAB-certified air carriers who were using the Dallas and Fort Worth airports first signed "letter agreements" and then later signed "use agreements" with the DFW Board, agreeing to move their air services to DFW as specified in the Ordinance. Southwest, which was solely running intrastate flights from Love Field and thus was exempt from CAB certification and pressure, refused

to move to DFW and did not sign a use agreement.  Litigation ensued over efforts to force Southwest from Love Field, terminating with our statement that "Southwest Airlines Co. has a federally declared right to the continued use of and access to Love Field, so long as Love Field remains open." *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 103 (5th Cir. 1977).

Congress deregulated the airline industry in 1978.  Shortly thereafter, Southwest applied for permission to provide interstate service between Love Field and New Orleans.  CAB granted the application, concluding that it lacked power to deny it.  This prompted Congress to intervene by enacting the Wright Amendment.  *See* Pub. L. No. 96-192, § 29, 94 Stat. 35, 48-49 (1980).  The Wright Amendment generally bans interstate service from Love Field.[1]  However, it provides certain exemptions from this ban, two of which are significant here:  (1) the commuter airline exemption allows interstate "air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less"; and (2) the contiguous state  exemption allows flights to and from Louisiana, Arkansas, Oklahoma, and New Mexico, if the flights do not "provide any through service

---

[1]     In its entirety, the Wright Amendment states:

(a) Except as provided in subsection (c), notwithstanding any other provision of law, neither the Secretary of Transportation, the Civil Aeronautics Board, nor any other officer or employee of the United States shall issue, reissue, amend, revise, or otherwise modify (either by action or inaction) any certificate or other authority to permit or otherwise authorize any person to provide the transportation of individuals, by air, as a common carrier for compensation or hire between Love Field, Texas, and one or more points outside the State of Texas, except (1) charter air transportation not to exceed ten flights per month, and (2) air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less.

(b) Except as provided in subsections (a) and (c), notwithstanding any other provision of law, or any certificate or other authority heretofore or hereafter issued thereunder, no person shall provide or offer to provide the transportation of individuals, by air, for compensation or hire as a common carrier between Love Field, Texas, and one or more points outside the State of Texas, except that a person providing service to a point outside of Texas from Love Field on November 1, 1979 may
continue to provide service to such point.

(c) Subsections (a) and (b) shall not apply with respect to, and it is found consistent with the public convenience and necessity to authorize, transportation of individuals, by air, on a flight between Love Field, Texas, and one or more points within the States of Louisiana, Arkansas, Oklahoma, New Mexico, and Texas by an air carrier, if (1) such air carrier does not offer or provide any through service or ticketing with another air carrier or foreign air carrier, and (2) such air carrier does not offer for sale transportation to or from, and the flight or aircraft does not serve, any point which is outside any such State. Nothing in this subsection shall be construed to give authority not otherwise provided by law to the Secretary of Transportation, the Civil Aeronautics Board, any other officer or employee of the United States, or any other person.

(d) This section shall not take effect if enacted after the enactment of the Aviation Safety and Noise Abatement Act of 1979.

*Id.*

or ticketing with another air carrier" and do not "offer for sale transportation to or from . . . any point which is outside any such State." *Id.*

In 1996, Dalfort Aviation, the parent corporation of Legend, announced plans to take advantage of the commuter airline exemption by reconfiguring large commuter planes to hold only 56 seats. In response, the DOT General Counsel issued an opinion holding that the exemption applied only to aircraft originally configured to seat less than 57 passengers. The DOT opinion was mooted by the 1997 passage of the "Shelby Amendment" (collectively with the Wright Amendment, the "Love Field amendments"). The Shelby Amendment defined the term "passenger capacity of 56 passengers or less" in the commuter airline exemption to "include[] any aircraft, except aircraft exceeding gross aircraft weight of 300,000 pounds, reconfigured to accommodate 56 or fewer passengers if the total number of passenger seats installed on the aircraft does not exceed 56." *See* Pub. L. No. 105-66, § 337, 111 Stat. 1425, 1447 (1997).[2] The Shelby Amendment also expanded the contiguous states exemption to allow direct flights between Love Field and airports within Kansas, Alabama, and Mississippi. *See id.*

The parties in this case responded in various ways to the Shelby Amendment. Southwest began offering flights between Love Field and Mississippi and Alabama. Legend has announced plans to offer longhaul service to states outside the Love Field service area using large aircraft reconfigured to have less than 57 seats. Continental Express plans to use regional jets with less than 57 seats to

---

[2] The Shelby Amendment provides in its entirety that:
    (a) IN GENERAL.--For purposes of the exception set forth in section 29(a)(2) of the International Air Transportation Competition Act of 1979 (Public Law 96-192; 94 Stat. 48), the term "passenger capacity of 56 passengers or less" includes any aircraft, except aircraft exceeding gross aircraft weight of 300,000 pounds, reconfigured to accommodate 56 or fewer passengers if the total number of passenger seats installed on the aircraft does not exceed 56.
    (b) INCLUSION OF CERTAIN STATES IN EXEMPTION.--The first sentence of section 29(c) of the International Air Transportation Competition Act of 1979 (Public Law 96-192; 94 Stat. 48 et seq.) is amended by inserting "Kansas, Alabama, Mississippi," before "and Texas".
    (c) SAFETY ASSURANCE.--The Administrator of the Federal Aviation Administration shall monitor the safety of flight operations in the Dallas-Fort Worth metropolitan area and take such actions as may be necessary to ensure safe aviation operations. If the Administrator must restrict aviation operations in the Dallas-Fort Worth area to ensure safety, the Administrator shall notify the House and Senate Committees on Appropriations as soon as possible that an unsafe airspace management situation existed requiring the restrictions.
*Id.*

fly between Love Field and Cleveland. Continental Express and American offer intrastate flights from

Love Field to their hubs, in Houston and Austin respectively.

In response, Fort Worth sued Dallas, the DFW Board, Legend, Continental, and Continental

Express in Texas state court to block the proposed additional service from Love Field. The state

court found that the Ordinance was not preempted by federal law and that Dallas was obligated by

the Ordinance to preclude airlines from flying between Love Field and areas outside Texas and the

four-state service area authorized by the Wright Amendment. The state action is currently on appeal,

although the state appellate court has stayed the appeal pending our resolution of this case.

While the state court action was pending, Dallas filed a federal suit against DOT and Fort

Worth requesting declaratory relief on essentially the same issues involved in the state action. The

federal court has stayed that proceeding pending resolution of the instant case.

At the urging of several of the parties, and while both the federal and state actions were

pending, DOT initiated the interpretative proceeding that is the subject of this petition for review.

DOT issued an order informing the parties in this action[3] that it intended to rule on four "federal law

issues" and allowing the parties an opportunity to submit comments on these issues. Subsequently,

in response to the parties' initial comments, DOT issued a procedural order which, *inter alia*, granted

the DFW Board's request to resolve a fifth legal issue and granted several parties' request for an

extension of time in which to file comments.

DOT ultimately issued a "Declaratory Order" resolving the five questions it had set forth.

Specifically, DOT ruled that:

> (i) the City of Fort Worth may not enforce any commitment by the City of Dallas . . . to limit operations at Love Field authorized by federal law, and the proprietary powers of the City of Dallas do not allow it to restrict services at Love Field authorized by federal law; (ii) the ability of the City of Dallas to limit the type of airline service operated at Love Field is preempted by the Wright and Shelby Amendments; (iii) any airline operating aircraft with a passenger capacity of no more than 56 passengers and a gross aircraft weight of no more than 300,000 pounds may operate service with any type of equipment and flights of any length from or to Love

---

[3] Notice of this order was not sent to the Committee. The Committee subsequently learned of the proceeding and DOT granted its request for an extension of time to file comments.

-5-

Field, notwithstanding any claim that such service violates any agreement between the Cities of Dallas and Fort Worth; (iv) the Dallas-Fort Worth International Airport Board may not enforce any contract provision that allegedly bars an airline from operating interstate airline service at another airport in the Dallas-Fort Worth metropolitan area; and (v) any airline may offer through service between Love Field and any other point to passengers using a flight between Love Field and another point within Texas operated under subsection (a) of the Wright Amendment, as amended by the Shelby Amendment . . . .

Declaratory Order at 58. In an accompanying "Procedural Order," DOT rejected various procedural objections raised by the parties. DOT subsequently reaffirmed its rulings on reconsideration.

## II

We have jurisdiction to review DOT's declaratory order by this petition for review. *See* 49 U.S.C. § 46110(e) ("[A] person disclosing a substantial interest in an order issued by the Secretary of Transportation . . . may apply for review of the order by filing a petition for review in the . . . court of appeals of the United States for the circuit in which the person resides or has its principal place of business."). The standard of review we apply differs according to the specific action DOT took.

Our review of DOT's interpretation of the statutes it is charged with administering is governed by the two-step standard of review established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed.2d 694 (1984). We first determine whether Congress directly spoke to the precise question in issue. If the intent of Congress is clear, then we, and the agency, must give effect to the unambiguously expressed intent of Congress. *See id.* at 842-43, 104 S. Ct. at 2781, 81 L. Ed. 2d at __. If Congress has not directly addressed the precise question in issue, we ask whether the agency's interpretation was "based on a permissible construction of the statute." *Id.* at 843, 104 S. Ct. at 2782, 81 L. Ed. 2d at __. As long as the agency's construction of an ambiguous statute is permissible, it must be upheld. *See id.*; *Texas Oil & Gas Assoc. v. EPA*, 161 F.3d 923, 937-38 (5th Cir. 1998).

However, we only engage in the *Chevron* analysis when reviewing an agency's interpretation of a statute it was charged with administering. When reviewing DOT's interpretation of a statute it is not charged with administering, we do not grant DOT *Chevron* deference. *See American Forest and Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir. 1998) ("We do not, however, accord *Chevron*

-6-

deference to EPA's interpretation of the ESA, because the ESA is not a statute that EPA is charged with administering.").

## III

Several of the parties challenge DOT's declaratory order on procedural grounds. They argue that: (a) DOT violated the Administrative Procedure Act ("APA"), (b) its order improperly contravened the earlier state court ruling on the same issues, and (c) DOT failed to comply with environmental requirements before issuing its order.

### A

Fort Worth and the DFW Board argue that DOT's ruling violated the APA in various ways. *See* 5 U.S.C. § 706 (directing a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law"). Although DOT has already rejected some of these challenges in its earlier rulings, we review *de novo* DOT's interpretation and application of the APA. *See Professional Reactor Operator Soc. v. U.S. Nuclear Regulatory Comm'n*, 939 F.2d 1047, 1051 (D.C. Cir. 1991) ("The Supreme Court has indicated, however, that reviewing courts do not owe the same deference to an agency's interpretation of statutes that, like the APA, are outside the agency's particular expertise and special charge to administer.").

#### 1

Several parties contend that DOT failed to provide them with sufficient notice as required under § 554(b) or, alternatively, § 553, of the APA. We exercise plenary review over whether DOT complied with applicable procedures. *See Chemical Mfrs. Ass'n v. EPA,* 870 F.2d 177, 198 (5th Cir. 1989).

DOT issued its declaratory order after conducting an informal adjudication, pursuant to its authority under § 554(e) to "issue a declaratory ruling to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e); *see also Texas v. United States*, 866 F.2d 1546, 1555 (5th Cir. 1989) ("The ICC's declaratory order was issued after an informal adjudication pursuant to the authority

conferred by 5 U.S.C. § 554(e) to 'issue a declaratory ruling to terminate a controversy or remove uncertainty.' Rendered in a specific factual context and resolving only the questions presented by [the petitions], it 'belongs to the genre of adjudicatory rulings.'") (citations omitted). Several parties object to DOT's failure to adhere to the APA's notice requirements for formal adjudications. However, in the absence of a statute requiring an agency to conduct its adjudication "on the record after opportunity for agency hearing," 5 U.S.C. § 554(a), an agency can define its own procedures for conducting an informal adjudication. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655-56, 110 S. Ct. 2658, 2680-81,110 L. Ed. 2d 563, __ (1990).

While the APA does not expressly require notice in informal adjudications, courts have inferred a requirement that there be "some sort of procedures for notice [and] comment . . . as a necessary means of carrying out our responsibility for a thorough and searching review [of agency action]." *Independent U.S. Tanker Owners Committee v. Lewis*, 690 F.2d 908, 923 (D.C. Cir. 1982). Here, DOT issued an order in which it specified the legal issues on which it would rule, allowed the parties to submit comments on these issues, and extended the comment period at the request of several parties. It then ruled on precisely the issues that it identified. We find that DOT's actions satisfied the minimum procedural notice requirements. *See id.*

Fort Worth contends that DOT failed to comply with § 554(b) by neglecting to notify parties that DOT would also be considering a factual issue: the effect of increased service at Love Field on DFW Airport. This argument fails for two reasons. First, as noted, the formal notice requirement of § 554(b) does not apply to an informal adjudication. Second, the parties were effectively on notice of this issue since it was one that they could reasonably expect to arise given the issues of which DOT gave notice. *Cf. Boston Carrier Inc. v. Interstate Commerce Comm'n*, 746 F.2d 1555, 1559 (D.C. Cir. 1984) ("The Commission is not burdened with the obligation to give every applicant a complete bill of particulars as to every allegation that carrier will confront."). The fact that Dallas, Continental Express, and Legend all submitted factual evidence to DOT should also have put Fort Worth on notice that it could submit its own factual evidence.

We also note the absence of anything in the record to indicate that Fort Worth possesses any information bearing on the impact of increased service at Love Field. Fort Worth has had three opportunities to present or identify such evidence—during the comment period, in its motion for reconsideration, and in its brief on appeal—but has not demonstrated that it possesses relevant factual information not considered by DOT. This continued failure to identify the evidence it would have submitted indicates that Fort Worth was not prejudiced by any inadequacy in DOT's notice. *See* 5 U.S.C. § 706 (in reviewing an agency determination, "due account shall be taken of the rule of prejudicial error"); *Friends of Iwo Jima v. Nat'l Capital Planning Comm'n*, 176 F.3d 768, 774 (4th Cir. 1999) ("Moreover, the party who claims deficient notice bears the burden of proving that any such deficiency was prejudicial.").

We also reject the DFW Board's argument that DOT's order amounts to a substantive rule subject to the notice and comment provision of § 553. Agencies have discretion to choose between adjudication and rulemaking as a means of setting policy. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294, 94 S. Ct. 1757, 1771, 40 L. Ed.2d. 134, __ (1974); *Mobil Exploration and Producing North America, Inc. v. FERC*, 881 F.2d 193, 198 (5th Cir. 1989) (citing *Bell Aerospace*). In determining whether an agency action constituted adjudication or rulemaking, we look to the product of the agency act ion. We also accord significant deference to an agency's characterization of its own action. *See British Caledonian Airways, Ltd. v. Civil Aeronautics Bd.*, 584 F.2d 982, 992 (D.C. Cir. 1977) ("In the present case we have, moreover, the Board's own assertion that its order is purely interpretive, and this contention in itself is entitled to a significant degree of credence . . . . While declaratory orders differ in some respects from interpretive rules, the same rationale should apply equally to an agency's characterization of one of its rulings as a declaratory order."). Since the APA defines "adjudication" as the "agency process for formulating an order," 5 U.S.C. § 551(7), and DOT classifies its ruling as a declaratory order, we find that the agency engaged in adjudication rather than rulemaking. Furthermore, because DOT's order interpreted the rights of a small number of parties properly before it, DOT did not abuse its discretion

by acting through an adjudicatory proceeding. *See British Caledonian Airways,* 584 F.2d at 992-94; *Mobil Exploration*, 881 F.2d at 199 (finding no abuse of discretion where, *inter alia*, an agency proceeded by adjudication to resolve an issue affecting a small number of parties).

**2**

Fort Worth, joined by American, also argues that it was deprived of its right to a fair agency determination because of *ex parte* contacts between Continental Express, Legend, and DOT. Fort Worth cites specific instances when Continental Express and Legend officials contacted DOT about the pending state and federal court actions and asked DOT to intervene in these actions. The officials suggested specific actions which DOT could take and strongly advocated for DOT's intervention, including by characterizing the state court proceedings in unfavorable terms. DOT responded at one point with a written letter answering four questions posed by Continental. DOT and Legend do not dispute that the contacts took place, but they both argue that the contacts were proper and did not bias DOT's final decision.

DOT regulations prohibit certain *ex parte* contacts between agency personnel and interested parties.[4] *See* 14 C.F.R. § 300.2(a). Most of the contacts here fall outside these regulations because they occurred before DOT instituted its interpretation proceeding. *See* 14 C.F.R. § 300.2(a) ("[T]here shall be no substantive communication in either direction between any concerned DOT employee and any interested person outside DOT, concerning a *public proceeding*, until after final disposition of the proceeding.") (emphasis added); *id.* § 300.2(b)(4)(v) (defining a public proceeding as a "proceeding initiated by a docket filing, other than a petition for generally applicable rulemaking, *after the filing in the docket of an identifiable written opposition to the initiating document*") (emphasis added). Additionally, most of the contacts, including those which occurred after DOT initiated its proceeding, did not involve the merits of the proceedings but rather were permissible

---

4    Fort Worth also relies on the APA ban on *ex parte* communications, but this ban does not apply here, because it does not cover informal adjudications. *See* 5 U.S.C. § 557(a), (d) (stating that the prohibition on *ex parte* contacts applies "when a hearing is required to be conducted in accordance with section 556 "); *id.* § 556 (governing formal hearings).

requests to intervene in the state and federal action. *See Texas*, 866 F.2d at 1550 (finding that an individual's request for the Interstate Commerce Commission to intervene in a pending state action was not an *ex parte* communication because it did not involve the merits of the case).

## B

The posture of the case presents more serious procedural concerns. DOT and the state court issued contrary rulings on some of the same issues in proceedings involving some of the same parties.[5]

Consequently, Fort Worth, the DFW Board, and American (collectively "Fort Worth petitioners") ask us to reverse DOT's action because (1) DOT violated the full faith and credit statute, 28 U.S.C. § 1738, by not granting preclusive effect to the prior state court ruling, and (2) DOT violated the Anti-Injunction Act and corresponding common law principles of federalism by issuing a declaratory order affecting a case currently pending before a state court. DOT rejected these arguments in its earlier rulings, but we do not defer to DOT's ruling on these issues. *See American Forest and Paper Ass'n*, 137 F.3d at 297.

## 1

The full faith and credit statute, 28 U.S.C. § 1738, generally requires federal courts to grant preclusive effect to state court judgments: "[t]he records and judicial proceedings of any court of any . . . State . . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." *Id.* The plain language of this section establishes that it does not apply here: § 1738 applies only to "every *court* within the United States," and DOT is an agency, not a "court." *Id.* (emphasis added). The only

---

[5] Although the state and DOT proceedings overlapped, neither tribunal made significant efforts to accommodate the views of the other. The state court essentially gave DOT one month to issue its declaratory order and when DOT failed to do this, the state court ruled without the benefit of DOT's views. DOT, on the other hand, did not issue its declaratory order within the time set by the state court, did not attempt to intervene in the state court action even though some of the parties there asked it to intervene, and did not ask the state court to stay its ruling until DOT ruled on the same issues. Instead, DOT rejected the state court's view in its order, noting only the state court's lack of reasoning in support of its position.

-11-

other circuit to address fully this issue agrees with this reading of § 1738.[6] *See NLRB v. Yellow Freight Systems, Inc.*, 930 F.2d 316, 320 (3d Cir. 1991) (finding that the NLRB, by virtue of its status as an agency rather than a court, was not required to give full faith and credit to an earlier state court judgment); *cf. Consolidated Oil & Gas, Inc. v. FERC*, 806 F.2d 275, 280 n.5 (D.C. Cir. 1986) ("We agree with the FERC, though, that '[t]he fact that the state court ruled on the same issue, regardless whether its ruling agreed with the Commission's ruling, does not affect the Commission's authority to determine its own jurisdiction.'").

The Supreme Court adopted this plain reading of § 1738 when presented with the question of whether a federal court must accord full faith and credit to an unreviewed state agency proceeding. *See University of Tennessee v. Elliott*, 478 U.S. 788, 794, 106 S. Ct. 3220, 3224, 92 L. Ed. 2d 635, __ (1986). Reading § 1738's references to "courts" as not including "agencies," the *Elliott* court concluded simply that "§ 1738 governs the preclusive effect to be given the judgments and records of state courts, and is not applicable to the unreviewed state administrative factfinding at issue in this case." *Id.* at 794, 106 S. Ct. at 3224, 92 L. Ed. 2d at __.

Finding that § 1738 does not apply to agencies does not end our inquiry, however, as courts "have frequently fashioned federal common-law rules of preclusion in the absence of a governing statute." *Id.* at 794, 106 S. Ct. at 3224, 92 L. Ed. 2d at __. The Supreme Court fashioned such a

---

[6]     The Fort Worth petitioners rely on two district court cases which have arguably held to the contrary.  In *Torres v. Gardner*, 270 F. Supp. 1 (D.P.R. 1967), the court stated in passing that "[t]he Administrative agencies of the United States are no less bound that he [*sic*] courts of the United States to give full faith and credit to the decisions of the Courts of Puerto Rico."  *Id.* at 4.  The court did not cite § 1738, and thus it might have relied instead on the common law preclusion doctrines we discuss below.  In *Midgett v. United States*, 603 F.2d 835 (Ct. Cl. 1979), the court cited *Torres* and stated:  "Section 1738 of 28 U.S.C. imposes on a federal court presented with a state court judgment the same force and conclusive effect as it has in the state in which it is rendered.  Administrative bodies of the United States as well as courts are required to adhere to this requirement."  *Id.* at 845 (citation omitted).  The court did not clearly indicate that it based its holding on § 1738, as opposed to merely analogizing to § 1738.

We cannot conclude with certainty whether these cases relied on § 1738.  To the extent they did, we believe the better rule, for the reasons stated above and herein, is that § 1738 does not apply to agencies, but the rationale underlying § 1738 extends to agencies through common law preclusion doctrines.  This rule is consonant with Supreme Court precedent and the plain text of § 1738, and it accounts for the concerns raised by the *Midgett* and *Torres* courts.

Fort Worth also argues that *United States v. ITT Rayonier, Inc.*, 627 F.2d 996 (9th Cir. 1980) addresses the question presented here.  In *ITT Rayonier*, the Ninth Circuit held that the Environmental Protection Agency ("EPA") was bound by res judicata from pursuing an enforcement action when a prior enforcement action had been litigated in state court.  *See id.* at 999-1004.  The Ninth Circuit applied res judicata because it found that the EPA was in privity with the parallel state agency which had pursued the state enforcement action.  *See id.* at 1002-04.  *ITT Rayonier* is distinguishable from the present case, because Fort Worth has made no showing that DOT was in privity with any party in the state court action.

rule in *Elliott*, requiring federal courts to grant preclusive effect to findings of fact by state agencies in most subsequent federal actions. *See id.* at 796-99, 106 S. Ct. at 3224-26, 92 L. Ed. 2d at __ (holding also that no preclusive effect should be given to state administrative agency factfinding in Title VII cases). To determine whether common law preclusion should apply here, we consider whether the policies favoring full faith and credit, including repose and federalism concerns, *see generally Allen v. McCurry*, 449 U.S. 90, 95-96, 101 S. Ct. 411, 415, 66 L. Ed. 2d 308, __ (1980) ("[R]es judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system."), outweigh the federal interests present here, *see Midgett*, 603 F.2d at 845 ("A judgment or decree of a state court whose effect would restrain the exercise of sovereign power of the United States by imposing requirements that are contrary to important and established federal policy would not be given effect in a federal court."); *cf. Yellow Freight*, 930 F.2d at 320 (discussing policy reasons why an agency should not be bound by § 1738). *See generally American Mannex Corp. v. Rozands*, 462 F.2d 688, 690 (5th Cir. 1972) (suggesting, in *dicta*, that § 1738 can be trumped by "well-defined [competing] federal policies"); 18 Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 4469, at 662-63 (1981) ("In various settings, federal courts have found that vital federal interests warrant rejection of the res judicata rules that state courts would apply to their own judgments.").

Applied here, the competing policy considerations weigh against requiring DOT to grant preclusive effect to the state court proceeding.[7] *Cf. Yellow Freight*, 930 F.2d at 320-22 (holding that the NLRB was not bound by an earlier arbitrator's factfinding, even though the arbitrator's ruling was affirmed by a state court, because essential evidence was not presented to the arbitrator). First, the importance of repose here, while not insubstantial, is limited by the posture of this case. At the time

---

[7] Because we resolve the matter on these grounds, we do not reach DOT's alternative argument that the state court judgment should not be granted preclusive effect because a Texas court would not grant the judgment preclusive effect. *See generally Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 374, 116 S. Ct. 873, 878, 134 L. Ed. 2d 6, __ (1996) ("When faced with a state court judgment relating to an exclusively federal claim, a federal court must first look to the law of the rendering State to ascertain the effect of the judgment.").

the state court issued its ruling, parallel agency proceedings were already underway.

Second, this case involves aviation regulation, an area where federal concerns are preeminent and where DOT is charged with representing those concerns. *See Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 366-67, 114 S. Ct. 855, 863, 127 L. Ed. 2d 183 (1994) ("The Secretary of Transportation is charged with administering the federal aviation laws . . . ."); *Northwest Airlines v. Minnesota*, 322 U.S. 292, 303, 64 S. Ct. 950, 956, 88 L. Ed. 1283, __ (1944) (Jackson, J., concurring) ("Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive."), *quoted in City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633-34, 93 S. Ct. 1854, 1860, 36 L. Ed.2d 547, __ (1973); 849 U.S.C. § 46101(a)(2) (granting the Secretary of Transportation discretion to "conduct an investigation . . . about . . . any question that may arise under this part"). Additionally, this case involves the operation of flights from Love Field, a matter on which Congress has twice specifically legislated. DOT's interpretive order is the first time that DOT, the agency specifically charged with administering the Wright Amendment, has interpreted the Shelby Amendment. *See Cramer v. Skinner*, 931 F.2d 1020, 1024 (5th Cir. 1991) (noting that "[t]he individual defendants in their official capacity, DOT, and DOT's Office of Aviation Analysis enforce the [Wright] amendment"); *State of Kansas v. United States*, 16 F.3d 436, 438 (D.C. Cir. 1994) (same). To allow the state court effectively to foreclose the administering agency from further consideration of the Shelby Amendment as to the parties which appeared before the state court would trump the key federal interests that motivated Congress to create DOT and give it authority over these laws.[8]

Finally, applying full faith and credit principles to DOT in this case would lead to inconsistent results. *Cf. Access Telecommunications v. Southwestern Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998) (noting that the primary jurisdiction doctrine, under which courts refer matters to agencies

---

[8]     These key federal interests are arguably lessened by the fact that DOT did not attempt to stay or intervene in the state court action; presumably if the federal interests were that important, DOT would have taken one of these actions. DOT's inaction is partially justified by the limited amount of time it had to intervene, as the state court only stayed the proceedings before it for one month.

-14-

when the matters are within agency jurisdiction, is motivated in part by the desire "to promote uniformity and consistency within the particular field of regulation"). Some of the parties before DOT are litigating these issues for the first time. Forcing DOT to grant preclusive effect to the state court ruling would lead to inconsistent application of the Shelby Amendment to the parties that did not appear before the state court.

In sum, because of the important federal interests here, we decline to hold that common law preclusion doctrines apply in this case. Instead, DOT properly declined to give preclusive effect to the state court judgment.[9]

## 2

The Fort Worth Petitioners also argue that DOT's actions violated the Anti-Injunction Act, 28 U.S.C. § 2283, which provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. We "follow the weight of authority in holding that [i]f an injunction would be barred by § 2283, this should also bar the issuance of a declaratory judgment that would have the same effect as an injunction." *Texas Employers' Ins. Ass'n v. Jackson*, 862 F.2d 491, 506 (5th Cir. 1988) (*en banc*) (quotation omitted) (alteration in original); *see also Travelers Ins. Co. v. Louisiana Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776 (5th Cir. 1993) ("[T]he district court may not consider the merits of the declaratory judgment action when 1) a declaratory defendant has previously filed a cause of action in state court against the declaratory plaintiff, 2) the state case involves the same issues as those

---

[9] We reject the Fort Worth petitioners' invocation of the so-called *Rooker-Feldman* doctrine for the same reasons. "In a nutshell, the doctrine holds that inferior federal courts do not have the power to modify or reverse state court judgments." *Matter of Reitnauer*, 152 F.3d 341, 343 (5th Cir. 1998) (applying the doctrine where "[t]he district court . . . made apparent its displeasure with the manner in which the state court interpreted and applied state law [and] such displeasure formed the basis for its reversal of the bankruptcy court's order"). As we have previously noted, the *Rooker-Feldman* doctrine is "very close if not identical to the more familiar principle that a federal court must give full faith and credit to a state court judgment." *Gauthier v. Continental Diving Servs., Inc.*, 831 F.2d 559, 561 (5th Cir. 1987). Thus, we have not applied the *Rooker-Feldman* jurisdictional bar in cases where we have found it inappropriate to require a federal court to give full faith and credit to a state court judgment. *See id.* (not applying the *Rooker-Feldman* doctrine where full faith and credit does not apply because the state court judgment would not be entitled to preclusive effect under state law). We follow this practice here. The Fort Worth petitioners have not cited any cases where the *Rooker-Feldman* doctrine has been applied to an agency ruling on matters of federal law previously addressed by a state court. In light of the above-noted concerns, we see no reason to extend the doctrine to this context.

involved in the federal case, *and* 3) the district court is prohibited from enjoining the state proceedings under the Anti-Injunction Act.") (emphasis in original).

As a federal agency, DOT's proceedings are exempt from the terms of § 2283, which applies only to proceedings in a "court of the United States." 28 U.S.C. § 2283; *see also id.* § 451 ("As used in this title[,] [t]he term 'court of the United States' includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good behavior."). Further, even where an action is ongoing in a "court of the United States," an agency's presence as a party, together with the federal interest the agency represents, can trump the application of § 2283. *See Mitchum v. Foster*, 407 U.S. 225, 235-36, 92 S. Ct. 2151, 2158-59, 32 L. Ed. 2d 705, __ (1972) ("[A] third exception [to § 2283], more recently developed permits a federal injunction of state court proceedings when the plaintiff in the federal court is the United States itself, or a federal agency asserting 'superior federal interests.'"); *Texas v. United States*, 837 F.2d 184, 186 (5ᵗʰ Cir. 1988) ("Moreover, because a federal agency seeks the injunction, the ICC's motion is not directly precluded by the strictly enforced rule of the Anti-Injunction Act, 28 U.S.C. § 2283."); *United States v. Lemaire*, 826 F.2d 387, 388 n.2 (5ᵗʰ Cir. 1987) ("The Act does not prevent the United States, or one of its agencies, from acting to protect a federal interest."). Thus, § 2283 does not restrict our ability to review the agency's decision.

Fort Worth's authority to the contrary is unavailing. The case before us is clearly distinguishable from *United Credit Bureau of America, Inc. v. NLRB*, 454 U.S. 994, 102 S. Ct. 539, 70 L. Ed. 2d 404 (1981) (Rehnquist, J., dissenting from denial of certiorari), where then-Justice Rehnquist dissented from the denial of certiorari to argue that "the concerns of federalism and comity comprehended by the Anti-Injunction Act should . . . apply to the NLRB." *Id.* at 997-98, 102 S. Ct. at 541, 70 L. Ed. 2d at __.[10] In *United Credit*, the NLRB ordered a party to dismiss a state court

---

[10]    We note in passing that, as a denial of a petition for certiorari, the *United Credit Bureau* opinion is not binding authority. *See Teague v. Lane*, 489 U.S. 288, 296, 109 S. Ct. 1060, 1067, 103 L. Ed. 2d 334 (1989).

action. It did this without "consider[ing] whether the state-court proceeding interfered with its ability to consider or dispose of [the agency petitioner's] charges." *United Credit*, 454 U.S. at 998, 102 S. Ct. at 541, 70 L. Ed. 2d at ___ (noting that the state court had not yet acted). Here, the state court action, at least at the trial level, was completed, thus lessening DOT's intrusion and strengthening its reasons for issuing its own interpretation of the legal issues. Also, DOT's interest here is not its interest in resolving an individual petitioner's claim, as in *United Credit*, but rather its interest in avoiding piecemeal application of a federal aviation statute.

Additionally, we do not believe that DOT violated general principles of federalism by issuing its ruling. Although the Fort Worth Petitioners correctly note that state courts are competent to resolve matters of federal law, this does not prevent federal agencies from acting within their authority to protect federal interests. Accordingly, the cases that the Fort Worth Petitioners cite in support of their federalism arguments are clearly distinguishable. *See, e.g.*, *Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 339 (5th Cir. 1999) (holding that a district court properly remanded a state law claim after dismissing federal claims, even though one of the state law claims involved a preemption defense, because "state courts, being of equal dignity with federal courts, are equally competent to address that potential defense").

## C

As a final procedural objection, the Committee argues that DOT improperly ruled without first preparing an environmental impact statement ("EIS"). The National Environmental Policy Act ("NEPA") directs "all agencies of the Federal Government . . . [to] include [an EIS] in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2). DOT found that it did not need to prepare an EIS, but because it is not charged with administering NEPA, its decision to not prepare an EIS is not entitled to deference. *See American Forest and Paper Ass'n*, 137 F.3d at 297.

The Committee argues that DOT's "decision" to allow increased flights constitutes a "major Federal action" under NEPA. We disagree. Agency decisions which "do not entail the exercise of

-17-

significant discretion" do not require an EIS. *Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta Regional Comm'n*, 599 F.2d 1333, 1344-45 (5th Cir. 1979). By enacting the Shelby Amendment, Congress, not DOT, made the decision to allow additional flights at Love Field. DOT merely issued an interpretation of federal law that it was required to adopt under the relevant statutes.[11] *See Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 513 (4th Cir. 1992) ("Other Circuits have held that when an agency has no discretion to consider environmental values implementing a statutory requirement, its actions are ministerial and not subject to NEPA."); *Goos v. ICC*, 911 F.2d 1283, 1296 (8th Cir. 1990) ("Because the ICC has not been granted any discretion under section 1247(d) to base its issuance of an NITU or CITU on environmental consequences, we agree that it would make little sense to force the ICC to consider factors which cannot affect its decision . . . ."); *Milo Community Hospital v. Weinberger*, 525 F.2d 144, 147 (1st Cir. 1975) (finding that no EIS was necessary where "consideration of the factors that the appellant has characterized as 'environmental considerations' could not have changed the Secretary's decision").[12]

## IV

The Declaratory Order stated that DOT intended to rule on four "federal law issues." DOT's subsequent Procedural Order added a fifth legal issue to the agency's docket. We review each of DOT's rulings in turn.

---

[11]     For example, 49 U.S.C. § 41713, which DOT interpreted here, does not grant DOT discretion because Congress has defined the extent of federal preemption and has specified which state rights remain. On the other hand, when DOT applies § 41714(c), governing the award of slots to new entrants, DOT is clearly granted discretion by the statute. *See* 49 U.S.C. § 41714(c) ("If the Secretary *finds it to be in the public interest and the circumstances to be exceptional*, the Secretary *may* by order grant exemptions from the requirements under subparts K and S of part 93 of title 14, Code of Federal Regulations, to enable new entrant air carriers to provide air transportation at high density airports. ") (parentheticals omitted and emphasis added). Thus, when applying § 41714, DOT follows NEPA. *See, e.g.*, *Applications of Trans States Airlines, Inc.*, DOT Order 98-4-21, 1998 DOT Av. LEXIS 159, at *54-*55 (1998) (conducting an environmental assessment in a § 41714 determination).

[12]     The Committee also argues that DOT failed to follow its own environmental procedures. The Committee relies on an FAA statement of "Polices and Procedures on Considering Environmental Impacts" which, as DOT notes, is inapplicable here because it "establishes Federal Aviation Administration (FAA) policies and procedures." DOT was not acting under the auspices of the FAA in this case. Instead, DOT asserts that the relevant DOT guidelines still require major agency action before undertaking an EIS, and we agree. *See* 44 Fed. Reg. 56420, 56424 (1979) ("An EIS shall be prepared for any proposed major Federal action significantly affecting the environment."); *see also id.* (requiring an environmental assessment when "a decision has not been make [*sic*] to prepare an EIS," but noting that the environmental assessment describes "the environmental impacts of a proposed action"). The Committee does not cite any contrary authority in its reply brief.

## A

We first turn to DOT's ruling that the preemption provision of the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1), preempted Dallas's and Fort Worth's obligations under the Ordinance. In reaching this decision, DOT also determined that Dallas's rights as the proprietor of Love Field did not permit it to bar airlines from operating the services authorized under the Shelby Amendment. On appeal, the Fort Worth Petitioners argue that the power to restrict services at Love Field falls within Dallas's rights as proprietor of the airport. Thus, they argue, Dallas has an existing contractual obligation to restrict service at Love Field so as to block airlines from operating the services permitted under the Shelby Amendment.

### 1

The ADA includes an express preemption provision, § 41713(b)(1), which generally prohibits states from enacting or enforcing a law or regulation "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). At the same time, the ADA reserves the state's authority to carry out its "proprietary powers and rights." 49 U.S.C. § 41713(b)(3) (hereinafter, the "proprietary powers exception").

The proper standard of review to apply to DOT's preemption determination is the subject of extensive debate and briefing among the parties. It is also an issue of first impression before us. The Fort Worth Petitioners contend that DOT's interpretation of the proprietary powers exception should be afforded no deference because DOT lacks both the authority and the expertise to interpret this section of the ADA. DOT, Dallas, and Continental Express argue that DOT's general authority to administer the ADA inherently includes the power to administer the statute's preemption provision. Consequently, they argue for deferential review of DOT's preemption determination under *Chevron*.

The Fort Worth Petitioners present several strong arguments in favor of *de novo* review. A preemption determination does indeed involve legal determinations, which are arguably more within the expertise of the courts. *See Colorado Public Utilities Comm'n v. Harmon*, 951 F.2d 1571 (10th Cir. 1991) (adopting a *de novo* standard of review because "[a] preemption determination involves

-19-

matters of law–an area more within the expertise of courts than within the expertise of the Secretary of Transportation"). In reaching its decision, DOT interpreted existing case law, a role more typically—and perhaps more appropriately— left to the courts. Beyond this, the task of defining what constitutes a "proprietary power" has traditionally been left to the courts. *See, e.g., National Helicopter Corp. of America v. City of New York,* 137 F.3d 81 (2d Cir. 1998) (assessing the validity of restrictions on operation at a heliport). Additionally, Congress appears to have evinced an intent to codify the proprietary rights existing when the ADA was enacted rather than an intent to allow DOT to define proprietary rights. *Cf. Western Air Lines v. Port Authority of New York and New Jersey*, 658 F. Supp. 952, 956 (S.D.N.Y. 1986) ("The legislative history of Section 1305(b)(1) indicates that the airport proprietor would be permitted to take those actions 'presently accepted as valid exercises of proprietary powers.'") (internal citation omitted).

DOT, however, presents strong arguments supporting the contrary position. DOT is charged with administering the aviation laws as a whole. *See Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 366-67 (5th Cir. 1994) ("The Secretary of Transportation is charged with administering the federal aviation laws . . . ."). More significantly, DOT is the "superintending agency" with respect to the administration of the ADA. *See American Airlines v. Wolens*, 513 U.S. 219, 229 n.6, 115A S. Ct. 817 n.6, 824, 130 L. Ed. 715, __ (1995). The First Circuit has come close to holding that this power encompasses the authority to interpret the preemption section of the ADA. *See New England Legal Foundation v. Massachusetts Port Authority*, 883 F.2d 157,167 (1st Cir. 1989) (finding that DOT was one of "two judicial actors with apparent jurisdiction over the [preemption] subject matter which they decided" ). Absent any clear evidence to the contrary, we are nearly persuaded that DOT possesses the authority to interpret the preemption provision of the ADA and that, consequently, we should defer to its interpretation of that provision. *See Texas Oil & Gas Ass'n,* 161 F.3d at 937. We need not, however, make this final determination here. Because we conclude that DOT's ruling that § 41713 of the ADA preempted the Ordinance was correct under either standard of review, we decline to decide this issue at this time.

**2**

Congress passed the ADA in 1978 in an effort both to end federal economic regulation of commercial aviation and to promote competition within the airline industry. Fearful that in the face of federal deregulation, states would enact conflicting laws regulating the airline industry, Congress enacted § 41713(b)(1) of the ADA, which provides that:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1); *see also New England Legal Foundation*, 883 F.2d at 173 ("In reducing federal economic regulation of the field . . . Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation."). When enacting the ADA, however, Congress also recognized that airport proprietors—the majority of which are municipalities, *see City of Burbank,* 411 U.S. at 635, 93 S. Ct. at 1860, 36 L. Ed.2d at __—were best equipped to handle local problems arising at and around their facilities. Accordingly, the ADA provides that the preemptive effect of § 41713(b)(1) does "not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport . . . from carrying out its proprietary powers and rights." 49 U.S.C.A. § 41713(b)(3).

The restrictions on service at Love Field under the Ordinance appear to operate as limitations "relating to . . . routes" within the meaning of § 41713(b)(1), *see Western Air Lines*, 658 F. Supp. at 952 (finding that a perimeter rule "relat[ed] to routes"), and the parties present no significant argument to the contrary. Consequently, the only issue before us is whether the power to enforce the restrictions falls within the proprietary powers exception. The Fort Worth petitioners contend that the restrictions on service at Love Field fall within Dallas's proprietary powers.

The precise scope of an airport owner's proprietary powers has not been clearly articulated by any court. *See, e.g., id.* at 956 ("The extent of 'proprietary powers and rights' has not yet been established."). However, several courts have examined when an airport owner's enactment of a

"perimeter rule"[13] or similar route restriction falls within the proprietary powers exception. These courts have recognized that local proprietors play an "extremely limited" role in the regulation of aviation. *See, e.g., id.* at 956 ("[A]irport proprietors have an 'extremely limited role' in the system of aviation regulation . . . .") (quoting *British Airways Bd. v. Port Auth.*, 564 F.2d 1002, 1010 (2d Cir. 1977)). In defining the permissible scope of a proprietor's power to regulate under § 41713(b)(3), federal courts have repeatedly held that an airport proprietor can issue only "reasonable, nonarbitrary, and nondiscriminatory rules that advance the local interest." *Id.* at 958; *see also National Helicopter Corp. of America*, 137 F.3d at 88-89 (limiting the permissible subject matter of local regulations to "aircraft noise and other environmental concerns at the local level"); *British Airways*, 558 F.2d at 84 (stating that a proprietor "is vested only with the power to promulgate reasonable, non-arbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs."); *cf. City and County of San Francisco v. FAA*, 942 F.2d 1391, 1394 (9th Cir. 1990) ("Congress made it clear, however, that the power delegated to airport proprietors to adopt noise control regulations is limited to regulations that are not unjustly discriminatory.").

Courts applying this standard have upheld route restrictions as within proprietary powers when they are targeted at advancing a specific local interest. To date, courts have permitted airport proprietors to enact regulations aimed at monitoring noise levels, *see Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 104 (9th Cir. 1981), tempering environmental concerns, *see National Helicopter of America*, 137 F.3d at 88, and managing congestion, *see Western Air Lines Inc. v. Port Authority of New York and New Jersey*, 817 F.2d 222 (2d Cir. 1987). *See generally* Cross, 17 Transp. L.J. at 106 ("An airport authority's proprietary function permits it to enact regulations benefitting citizens who live near the airport, such as airport noise regulations or airport curfews."). In each of these cases, the proposed restriction was targeted at alleviating an existing problem at the

_____

[13] An airport perimeter rule "establish[es] maximum permissible distances of non-stop flights into and out of a given airport." *See* Jonathan Whitman Cross, *Airport Perimeter Rules: An Exception to Federal Preemption*, 17 Transp. L.J. 101, 102 (1988). The Wright Amendment itself, by allowing interstate service to only the four states bordering on Texas, operates as a perimeter rule. Similarly, because § 9.5 of the Bond Ordinance has been enforced so as to allow the range of flights permitted under the Wright Amendment, it effectively operates as a perimeter rule.

airport or in the surrounding neighborhood. For example, in *Western Air Lines,* the Second Circuit upheld a 1,500-mile perimeter rule enacted by the Port Authority at LaGuardia Airport as a reasonable means both of alleviating congestion at LaGuardia and of preserving the shorthaul status of that facility. *See Western Air Lines,* 817 F.2d at 226. More recently, the Second Circuit considered the validity of a special use permit that imposed significant restrictions on the use of a local heliport. *See National Helicopter Corp.* 137 F.3d 81. Finding that the proprietor exception allowed municipalities only to promulgate "'reasonable, nonarbitrary and non-discriminatory' regulations of noise and other environmental concerns at the local level," *id.* at 88, the Second Circuit upheld only the restrictions that were aimed at reducing noise or other environmental concerns at the heliport. Significantly, the court struck down the restriction on sightseeing routes, finding that "Congress, the Supreme Court, and we have consistently stated that the law controlling flight paths through navigable airspace is completely preempted." *Id.* at 92.[14]

The only case which might support the Fort Worth Petitioners' view of Dallas's proprietary powers at Love Field is *Arapahoe County Public Airport v. Centennial Express Airlines, Inc.*, 956 P.2d 587 (Colo. 1998). To the extent that *Arapahoe* holds that it is within an airport owner's proprietary powers to restrict service at a local airport without articulating a viable purpose for the restriction, we view that case as deviating from the generally accepted rule that we adopt here. In *Arapahoe*, the Colorado Supreme Court—without finding any purpose for the restriction beyond the proprietor's bald assertion that it would "strip" the airport Authority "of its ability and authority to manage the Airport," *see id.* at 59—upheld a municipal proprietor's ban on all passenger service at Centennial Airport, s*ee id.* at 595. We fear that under the rationale of *Arapahoe*, virtually any regional regulation enacted by a proprietor would fall within the proprietary powers exception. This would

---

[14]      In *City of Houston*, we touched upon the proprietary rights exception when we upheld the FAA's authority to enact a 1,000-mile perimeter rule at Washington National Airport. In that case, the FAA enacted the rule as a means of limiting traffic at National, preserving the short-haul status of National, and assuring the utilization of the flagging Dulles Airport nearby. In relying on *City of Houston* for support, the Fort Worth Petitioners overlook the fact that we explicitly avoided engaging in a full analysis of the preemption provision in that case. Rather, we found that since the ADA preempted *state* regulation of routes, the restrictions of § 41713 did not apply to the FAA, a branch of the federal government. Thus, our decision in *City of Houston* does little to advance the Fort Worth Petitioners' argument.

expand the regulatory role of municipal owners far beyond the "extremely limited role" envisioned by the ADA.[15]

We are not persuaded by the Fort Worth Petitioners' attempt to fit the restrictions at Love Field into the existing federal case law defining the scope of proprietary rights. On its face, the Ordinance is clearly not aimed at alleviating noise, pollution, or congestion at Love Field, nor do the Fort Worth Petitioners assert such claims. Rather, they extract from *Western Air Lines* and *City of Houston* an overly broad rule that it is within an airport owner's proprietary powers to allocate traffic between two airports so as to preserve the shorthaul nature of one facility. Such a contention misses the import of both cases; that a proprietor can enact a perimeter rule *if it articulates a need for the restriction*. The Fort Worth Petitioners seem to overlook the *Western Air Lines* court's repeated emphasis that the primary goal of the restriction was to reduce congestion at LaGuardia, and the allocation of traffic between LaGuardia and Kennedy Airports was a means of attaining this goal. The court specifically held that "a perimeter rule, as imposed by the Port Authority to manage congestion in a multi-airport system, serves an equally legitimate local need and fits comfortably within that limited role, which Congress has reserved to the local proprietor." *Western Air Lines*, 658 F. Supp. at 958. Similarly, to the extent that *City of Houston* touched upon the scope of proprietary powers, we spent the bulk of our opinion emphasizing the fact that allocation of flights between Dulles and National was necessary to encourage use of Dulles Airport and ameliorate the overuse of National. *See City of Houston,* 679 F.2d at 1187. In neither case was re-allocation of flights between airports a goal in and of itself.

The fact that the restrictions in the Ordinance do not advance a local interest articulated in prior case law is not dispositive of this issue. We do not limit the scope of proprietary rights to those

<hr/>

[15]  *Arapahoe* is also factually distinguishable from the present case. First, while in *Arapahoe*, the court found that the ban on passenger service did not constitute a restriction on "rates, routes or services" within the meaning of the ADA, the restrictions under the Ordinance clearly amount to route restrictions. Second, the passenger service at issue in *Arapahoe* had never been permitted at Centennial Airport. In reaching its conclusion, the court emphasized that "[t]he power to control an airport's size exists at the core of the proprietor's function and is especially strong where, as here, the prohibited use has never been allowed, or even contemplated." *Arapahoe,* 956 P.2d at 595. In contrast, passenger flights on planes of all sizes have long been permitted at Love Field.

which have been previously recognized. *Cf. Western Air Lines*, 658 F. Supp. at 957 ("Section 1304(b)(1) [recodified as 41713(b)(1)] does not expressly limit proprietary powers to the regulation of noise, although presumably Congress would have so limited the section if that is what it had in mind."). Thus, we are open to assessing whether the restrictions in the Ordinance are reasonable and non-discriminatory rules aimed at advancing a previously unrecognized local interest. The Fort Worth petitioners fail, however, to offer a viable alternative justification for the route limitations that might support extending the recognized scope of a proprietor's powers under § 41713(b)(3). To allow enforcement of the Ordinance under the proprietary powers exception extends that exemption beyond its intended limited reach.[16]

In sum, reviewing DOT's ruling *de novo*, we affirm the agency's determination that § 41713(b)(1) of the ADA preempted the Ordinance's restrictions on operations at Love Field. Clearly, under the less stringent *Chevron* review, DOT's interpretation of the preemption provision would also be reasonable. Under either standard, DOT's interpretation is affirmed.[17]. DOT's ruling was arguably broader than this, addressing the cities' ability to regulate any services at Love Field. We limit our analysis to the only question before us, whether the Ordinance is preempted.[18]

**B**

We next review DOT's ruling that the Wright Amendment's "commuter aircraft exemption" authorized carriers using jets with passenger capacity of 56 seats or less to engage in long-haul service from Love Field to any city in the United States. DOT ruled and argues on appeal that the "commuter aircraft exemption" imposes no geographical limitation on the service that can be provided with smaller aircrafts and therefore authorizes longhaul service at Love Field with any aircraft with a capacity of less than 57 passengers. Not surprisingly, intervenors Continental Express and Legend Airlines—each of whom plan to offer longhaul service out of Love Field on regional or reconfigured

---

[16]    Finally, we need not reach the question of whether there is a "multi-airport proprietor" requirement in either the case law or the ADA such that a local proprietor can only enact route restrictions that allocate between two airports if it owns both facilities. Since we find that the restrictions at issue here are impermissible regardless of ownership, the issue of whether Dallas controls both Love Field and DFW is irrelevant to our analysis.

[17]    DOT alternatively ruled that the Wright and Shelby Amendments impliedly preempt the cities' ability to enforce the Ordinance.

 Because we find that the amendments expressly preempt enforcement of the Ordinance, we decline to address this issue here.

-25-

jets—agree with this position. The Fort Worth Petitioners contend that DOT misinterpreted the Love Field amendments and that the exemption authorizes only short-haul service at Love Field.

Because the DOT is authorized to administer the Wright and Shelby Amendments, *see Continental Air Lines, Inc. v. Dep't of Transp.,* 843 F.2d 1444, 1449 (5th Cir. 1988) ("Here, Congress fashioned a specific provision which the agency (once CAB, now DOT) has been called upon to interpret."), we review its decision under the two-step *Chevron* analysis.

This inquiry most logically begins with a review of the statutory text. Subsection (a)(2) of the Wright Amendment exempts from the general ban against interstate flights at Love Field "air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less." § 29, 94 Stat. at 48. Section (a) of the Shelby Amendment defines the term "passenger capacity of 56 passengers or less" to include "any aircraft . . . reconfigured to accommodate 56 passengers or fewer if the total number of passenger seats installed on the aircraft does not exceed 56." § 377(a), 111 Stat. at 1447. A plain reading of these provisions appears to permit longhaul service at Love Field on a commuter airline with a passenger capacity of fewer than 57.[19]

The slightly more complicated issue here is what type of aircraft is covered under the "commuter airline" exemption. DOT interpreted the commuter airline exemption as applying to any aircraft—whether a "regional jet" or turboprop plane—with a capacity of 56 passengers or less. Legend and Continental Express agree with this interpretation. The Fort Worth Petitioners, on the other hand, argue that the exemption in subparagraph (a)(2) of the Wright Amendment applies only to "commuter aircrafts" and not to regional jets. These differing views, in addition to Congress's failure to define the term "commuter airline," persuade us that the meaning of that term is ambiguous. *See Continental Air Lines*, 843 F.2d at 1454 ("The language of the [commuter airline exemption] is, we are persuaded, ambiguous."). Consequently, we turn to step two of *Chevron* and assess the reasonableness of DOT's interpretation.

The Fort Worth Petitioners contend that DOT erred in failing to interpret the phrase "commuter airline" as a limitation on the commuter aircraft exemption. As an initial matter, to the extent that American attempts to resurrect the argument that the term "commuter airlines" cannot refer to an air carrier offering longhaul service, we agree with and adopt the rationale of the District of Columbia Circuit in *Continental Air Lines*. In that case, the court upheld as reasonable DOT's interpretation of the commuter airlines exemption as restricting the type of aircraft that could operate unrestricted service at Love Field rather than the class of airlines that could operate longhaul services at the facility.

---

[19] In interpreting the commuter airline exemption in this manner, we keep in mind that Congress enacted the Love Field amendments with the intention of preserving Love Field as a primarily shorthaul facility. *Cf. Cramer v. Skinner,* 931 F.2d 1020, 1031 (5th Cir. 1991). We are, however, persuaded by DOT's argument that this interpretation will not undermine Love Field's status as a primarily short-haul airport since both the Wright and Shelby Amendments still place significant restrictions on the long-haul service permitted on larger jets.

*See id.* at 1454-55.

Fort Worth presents a different argument, namely, that the term "commuter" limits the type of aircraft to the kind of turboprop aircrafts that were in use at the time the Wright Amendment was enacted. Regional jets, it contends, "cannot qualify as 'commuter' aircraft." We disagree. First, Congress chose not to define "commuter airline" by reference to the kind of planes with a limited passenger capacity in 1979 and we decline to define that term for it here. *Cf. Continental,* 843 F.2d at 1454 ("First, Congress might have defined 'commuter airlines' with greater specificity by explicitly incorporating definitional references to agency regulations, but it chose not to do so. We cannot say that Congress meant to incorporate those regulatory definitions absent indications of its intention to do so in the statute or the legislative history."). Furthermore, to impose such a definition would essentially penalize those airlines who chose to update their technology as the airline industry advanced over the past twenty years.

Second, the Fort Worth Petitioners' definition of a "commuter airline" essentially renders the Shelby Amendment meaningless. The City of Fort Worth's contention that "the Shelby Amendment merely permits the use of reconfigured jet aircraft *if* the aircraft otherwise qualifies as a *commuter* aircraft" is nonsensical since, under its own definition of a "commuter airline," a reconfigured jet would *never* qualify as a commuter plane.[20] The more rational view is that the term "operating aircraft with a passenger capacity of 56 passengers or less" as defined by the Shelby Amendment, defines the term "commuter airlines" so as to include all planes weighing less than 300,000 pounds, including regional jets, with a passenger capacity of less than 57. Thus, our reading of the commuter aircraft exemption leads us to conclude that DOT's interpretation of the commuter aircraft exemption as permitting carriers using jets with a 56-passenger capacity to engage in longhaul service at Love Field is reasonable.

## C

DOT found that, "[f]or the same reasons [the cities could not directly limit services from Love Field], the DFW Board may not prohibit or limit an airline's use of a competing airport" through the use agreements. DOT Order 98-12-27 at 52. Continental Express agrees with this ruling,[21] while the DFW Board, Dallas, and Fort Worth argue that the use agreements are not preempted. We again need not decide whether we must defer to DOT's ruling on this point

---

[20]     The Fort Worth Petitioners also argue that DOT's interpretation violates the agency's previous ruling that Congress enacted the Wright Amendment in an effort to limit operations at Love Field to shorthaul service. In reality, Congress always permitted limited longhaul service at Love Field. From its inception, the Wright Amendment allowed for limited longhaul service on aircrafts with limited capacity and, as stated above, we do not think that DOT's ruling will radically alter Love Field's status as a primarily shorthaul airport.

[21]     American filed a request to intervene and a request to file an intervenor's brief that conditionally supports DOT's ruling on the use agreement issue. Legend subsequently moved to strike American's proposed intervenor brief. American's request to intervene is untimely, *see* Fed. R. App. P. 15(d), and American has not shown that we should treat its proposed intervenor brief as a supplemental brief under 5th Circuit Local Rule 28.5. Accordingly, we DENY American's motions to intervene and to file a brief as an intervenor and DENY as moot Legend's motion to strike American's intervenor brief.

because we would uphold it even if we reviewed it *de novo*.

In determining whether government contracts are subject to preemption, the case law distinguishes between actions a state or municipality takes in a proprietary capacity—actions similar to those a private entity might take—and actions a state or municipality takes that are attempts to regulate. The former type of action is not subject to preemption while the latter is. For example, in *Building & Trades Council v. Associated Builders*, 507 U.S. 226, 113 S. Ct. 1190, 122 L. Ed. 2d 565 (1993), the Supreme Court held that a labor contract was not preempted by the National Labor Relations Act because it was not "government regulation" but rather "constitute[d] proprietary conduct." *Id.* at 232, 113 S. Ct. at 1199, 122 L. Ed. 2d at __. More recently, in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Texas*, 180 F.3d 686 (5th Cir. 1999), we considered whether a municipal ordinance and a contract entered into pursuant to that ordinance were preempted as "law[s], regulation[s], or other provision[s] having the force and effect of law." *Id.* at 691. Analyzing the contract and the ordinance in the same manner, we held that neither was preempted because both were valid exercises of proprietary power rather than impermissible attempts to regulate. *See id.* at 693-94; *see also Associated Gen. Contractors of America v. Metropolitan Water Dist. of S. Cal.*, 159 F.3d 1178, 1182-83 (9th Cir. 1998) (holding that labor contracts between a state entity and private groups were not "laws" because they were not efforts to regulate but rather "reflect[ed] an owner's desire to contractually assure peace and prosperity on particular projects").

Thus, the critical inquiry here is whether the use agreements represent a valid exercise of the cities' proprietary powers. This question is easily resolved. The use agreements are essentially coextensive with the Ordinance, indicating in their breadth an intent to achieve everything achieved by the Ordinance. *Cf. Cardinal Towing*, 180 F.3d at 694 (looking to the scope of the contract and the activity it covered to determine whether it represented an attempt to regulate). They were enacted to effect the Ordinance, and the most recent version of the agreements directly links the airlines' obligations to the terms of the Ordinance: "Airline agrees that it shall conduct its Certificated Air Carrier Services serving the Dallas/Fort Worth areas to, from and at the Airport, to the extent required by the terms of the 1968 Regional Airport Concurrent Bond Ordinance."[22] Given this overlap, for the same reasons we have already determined that the Ordinance is preempted as an improper attempt to regulate, we must determine that the use agreements are preempted as an impermissible attempt to regulate in an area where the federal government has preempted state regulation.[23] *See Skydiving Center of Greater Washington, D.C., Inc. v. St. Mary's County Airport*

---

[22]  Earlier versions of the use agreements and the original letter agreements contain similar language.

[23]  Thus, this case is distinguishable from the Supreme Court's recent decision in *Wolens*, where the Court addressed a class action by passengers against an airline over changes the airline made to its air-miles program. *See Wolens*, 513 U.S. at 224-25, 115 S. Ct. at 822, 130 L. Ed. 2d at __. The Court first found that the passengers' state consumer protection act claims were preempted by federal law, because their claims related to "rates" and "services."

*Comm'n*, 823 F. Supp. 1273, 1284 (D. Md. 1993) (finding that when federal law preempted a municipal corporation's ban on off-site parachute landings, it also preempted lease provisions between the corporation and the skydiving center that incorporated this ban by reference).

The parties favoring the use agreements contend that even if the use agreements were preempted, the signatories waived their preemption rights by voluntarily entering into the agreements. DOT rejected this argument by finding that any waiver was invalid as violative of public policy. *See, e.g.*, *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 900-01 (1945) (noting "that a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy," and holding that in the case before it, employees could not waive their private rights to liquidated damages because of the public interest at stake).

We need not address the waiver issue because we find it inapplicable here. Section 41713 does not expressly announce affirmative rights for airlines, but instead bars states from regulating in certain areas. The airline signatories cannot "waive" this preemption because there is no indication that the federal preemption is limited to granting them individual rights. *Cf. Niswonger v. American Aviation, Inc.*, 411 F. Supp. 769, 771 (E.D. Tenn. 1975) (holding, without analysis, that "[t]he lease indenture of June 16, 1969 between American and the authority violates 49 U.S.C. § 1349(a), a statute enacted for the protection of the public, in so far as it grants American the exclusive right for the use of the landing area and the air navigation facility at the airport").

**D**

Finally, we review DOT's ruling that the Wright Amendment permits an airline to offer through

---

*See id.* at 228, 115 S. Ct. at 823-24, 130 L. Ed. 2d at __. The Court proceeded to find, however, that the plaintiffs could still pursue contractual claims against the airlines because, unlike the consumer protection statute, the contracts were "privately ordered obligations" which "did not amount to a State's enact[ment] or enforce[ment] [of] any law." *Id.* at 228-29, 115 S. Ct. at 824, 130 L. Ed. 2d at __ (quotations omitted) (alterations in original). It based this finding in part on the fact that "[m]arket efficiency requires effective means to enforce private agreements." *Id.* at 230.

As several of the parties note, *Wolens* is distinguishable from this case because it did not involve a contract entered into by a state. Instead, the contracting parties in *Wolens* were private actors. Thus, the only question of state regulation in *Wolens* was the more tangential question of whether the contract could be enforced in state court. *See id.* at 229 n.5, 115 S. Ct. at 824 n.5, 130 L. Ed. 2d at __.

Additionally, although *Wolens* referred to the importance of contracts in ensuring "market efficiency," there has been no convincing showing here that the parties entered into the use agreements for this purpose. Instead, it seems that they entered into the use agreements to implement an agreement between the cities to regulate airport use in the Dallas-Fort Worth area.

service from Love Field to points outside the Love Field service area as long as the airline uses a city within Texas as a connecting point and a 56-passenger aircraft to get to that point.[24]  While DOT, Continental Express, and Legend Airlines argue that we should uphold this ruling, every other party to this action—Dallas, Fort Worth, the DFW Board, Southwest Airlines, and American Airlines—contends that permitting an airline to offer through service between Love Field and "the world" violates both the plain meaning of and the congressional intent behind the Wright Amendment. Once again, since DOT is charged with administering the Wright Amendment, we review its ruling under the two-step *Chevron* analysis.  *See Texas Oil & Gas Ass'n*, 161 F.3d at 937-38.

This issue arose from Continental Express's decision to offer and advertise through service between Love Field and "the world."  Continental Express flies passengers from Love Field to Houston's Intercontinental Airport on an aircraft with a maximum capacity of 56 passengers and then transfers them to worldwide flights on large jets.  Passengers taking advantage of this service receive one ticket and, though they must change planes, do not have to reclaim and recheck their luggage at the connecting point.

As discussed above, subsection (a)(2) of the Wright Amendment excludes from section (a)'s general prohibition against interstate transportation flights out of Love Field that are operated on an aircraft with a capacity of 56 passengers or less.  Subsection (c) of the Amendment permits flights between Love Field and any point in Texas or one of the four contiguous states (later expanded to seven) on any size aircraft as long as "(1) such air carrier does not offer or provide any through service or ticketing with another air carrier or foreign air carrier, and (2) such air carrier does not offer for sale transportation to or from, and the flight or aircraft does not serve, any point which is outside any such State." § 29, 94 Stat. at 48.

---

[24]    As an initial matter, we clarify the precise issue addressed in DOT's Declaratory Order.  DOT purportedly determined "[w]hether the Wright and Shelby Amendments allow an airline to offer through service from Love Field to points outside the seven-state area within which unrestricted service is permitted, if the airline uses a city *within the seven-state area* as a connecting point and uses aircraft with no more than 56 seats for its flights between Love Field and the connecting point."  Declaratory Order at 18 (emphasis added); *see also* DOT Procedural Order at 3 (Sept. 3, 1998).  The substance of DOT's ruling, however, is geared towards the specific service offered by Continental Express and therefore considered solely whether the Love Field amendments permit an airline to offer through service through a point *within Texas*.  We limit the scope of our review to the narrower question actually resolved by DOT.

DOT interpreted subsection (a)(2) as authorizing the service offered by Continental Express. More specifically, DOT reads the commuter airlines exemption to exempt planes with a passenger capacity of less than 57 from all restrictions in the Wright Amendment. Under this interpretation, the restrictions on service in subsection (c)–including the restrictions on through service–do not apply to aircrafts operating under the commuter airline exemption. In contrast, the Fort Worth Petitioners, Southwest Airlines, and the City of Dallas contend that DOT's interpretation violates the plain language of the Wright Amendment. Under their interpretation of the statute, the restrictions on service in subsection (c)(2) apply to both commuter flights under subsection (a)(2) and flights on large aircrafts.

These two plausible yet conflicting readings of the relevant provisions of the Wright Amendment, coupled with a lack of legislative history illuminating the proper interaction between subsections (a)(2) and (c)(2), convince us that Congress did not speak directly to the issue before us. Accordingly, we move to step two of *Chevron* and inquire whether DOT's interpretation is a reasonable one. Under *Chevron*, an agency's interpretation is "reasonable" if it is "not patently inconsistent with the statutory scheme." *See Continental,* 843 F.2d at 1452 (citations omitted). We need not agree with DOT's interpretation in order to uphold it as reasonable. *See Exxon Corp. v. Lujan*, 970 F.2d 757, 761 (10th Cir. 1992) ("The agency's interpretation need not be the only one it could have adopted, or the one that this court would have reached had the question initially arisen in a judicial proceeding.") (citation omitted).

We are persuaded that DOT's interpretation of the Wright Amendment is a permissible one within the meaning of *Chevron*. DOT grounds its ruling largely on the argument that by imposing an express restriction on through service on large jets operating under subsection (c)(2) but declining to impose a similar restriction on commuter planes operating under section (a)(2), Congress was evincing its intent to permit small aircrafts to fly without such a restriction.[25] We view this reading of the

---

[25] Each party opposing DOT's position argues that it conflicts with the agency's 1985 Order holding that Continental could not provide interlining service on a large jet through a connecting point in Texas. *See* Love Field Amendment Proceeding, DOT Order 85-12-81, 1985 WL 57886 (1985). In that interpretive proceeding, DOT

-31-

amendment as reasonable and not inconsistent with a statutory scheme aimed at preserving Love Field as a primarily shorthaul facility while still allowing some longhaul service. *See* H.R. Conf. Rep. 96-716, at 24 (1979), *reprinted in* 1980 U.S.C.C.A.N. 78, 86 (stating that the Wright Amendment "embodies a compromise which permits limited commercial passenger service in interstate transportation at Love Field.").

This is not to say that we find DOT's interpretation to be the only or the best reading of the Wright Amendment. In order to reach its decision, DOT necessarily defined "air transportation on 56-passenger capacity planes" as including air service provided *in part* by such aircrafts. Similarly, it implicitly defined intrastate service as including flights with only an intrastate portion. These interpretations strain the meaning of both terms. Furthermore, we note with concern the potential impact of DOT's ruling. While it seems unlikely that permitting interstate service outside of the Love Field service area on small planes would have any impact on DFW's role as the Dallas area's primary long-haul facility, it seems significantly more likely that following the DOT ruling, airlines who already operate small aircrafts will commence interlining service connecting in Houston or another Texas airport. However, determinations of this nature are directly within DOT's expertise, not ours, and we will not substitute our judgment on aviation-related issues for their reasonable one. Accordingly, we affirm DOT's ruling as a reasonable interpretation of the Wright Amendment.

V

For the foregoing reasons, we DENY the petitions for review and AFFIRM DOT's orders.

---

addressed whether airlines could provide interlining service exclusively on large planes. There, DOT essentially agreed with an earlier CAB ruling that an air carrier could not "evade the [Wright] Amendment's restrictions by providing flights, for example, between Love Field and Houston and then continuing the flights between Houston and points outside the five-state area." 1985 WL 57886, at *11(citation omitted). We agree with DOT that its previous interpretation can be distinguished on the grounds that DOT premised its earlier order on an interpretation of section (c)(2) of the Wright Amendment, whereas the agency's decision here relies primarily on an interpretation of section (a).